78 P.3d 756

**Clarence P. CABATBAT,
Claimant–Appellant,**

**v.**

**COUNTY OF HAWAI'I, DEPARTMENT
OF WATER SUPPLY, Employer–
Appellee, Self–Insured.**

**No. 23836.**

Supreme Court of Hawai'i.

Nov. 4, 2003.

As Corrected Dec. 8, 2003.

Nelson H. Kinoshita, on the briefs, for claimant-appellant.

Joseph K. Kamelamela, Deputy Corporation Counsel, County of Hawai'i, on the briefs, for employer-appellee, self-insured.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

We hold that the Labor and Industrial Relations Appeals Board (the Board) erred in relying exclusively on a part of the American Medical Association, *Guides to the Evaluation of Permanent Impairment* (4th ed., AMA 1993) [hereinafter AMA Guides] in affirming a Hawai'i Department of Labor and Industrial Relations Disability Compensation Division (DCD) decision determining that Claimant–Appellant Clarence Cabatbat (Cabatbat) suffered a permanent partial disability (PPD) of eight percent as a result of a work-related injury to his temporomandibular joint (TMJ).[1] We hold further that Hawai'i Administrative Rule (HAR) § 12–10–21 permitted the use of other guides, and the Board's decision was against the reliable, probative, and substantial evidence on the record.

I.

On January 25, 1994, while driving a County of Hawai'i van in the course of his employment as a pipefitter with Employer–Appellee County of Hawai'i, Department of Water Supply (the County), Cabatbat was rear-ended by another vehicle. Cabatbat sustained injuries to his left foot, neck, and mandible near the TMJ as a result of this accident.

Immediately after the accident, Cabatbat sought treatment with Roy Koga, M.D. In May of 1994, Dr. Koga referred Cabatbat to Dentist Neal Nakashima to begin extensive treatment for his TMJ condition.[2] On August 29, 1995, Dr. Nakashima submitted a report to the County detailing Cabatbat's progress during Phase I, the pain management phase of the treatment plan. The report indicated that Cabatbat's TMJ injury had improved by ninety percent. By November 2, 1995, Dr. Nakashima listed Cabatbat's status as "nearly stable." On April 3, 1996, Dr. Nakashima submitted an update which placed Cabatbat's progress in Phase II of the treatment plan at sixty to seventy percent, and rated Cabatbat's status as "stable." By August 9, 1996, Dr. Nakashima's updated treatment plan report noted that Cabatbat had achieved ninety percent progress in Phase II.

On September 25, 1996, the DCD filed a stipulation and settlement agreement between Cabatbat and the County concerning the injuries to Cabatbat's neck and left foot. The parties agreed that Cabatbat suffered eight percent PPD for the neck injury, and twelve-point-five percent PPD for the injury to the left foot. Cabatbat's PPD rating in regard to his TMJ was not determined at this time.

---

1. The temporomandibular joint pertains to "the temporal bone and the mandible." Richard Sloane, *The Sloane–Dorland Annotated Medical–Legal Dictionary* 518 (West Supp.1992). The temporal bone is "one of two irregular bones forming part of the lateral surfaces and base of the skill, and containing the organs of hearing," and the mandible is "the bone of the lower jaw." Richard Sloane, *The Sloane–Dorland Annotated Medical–Legal Dictionary* 515 (West 1987).

2. Temporomandibular Joint Syndrome is

[a] dysfunction of the temporomandibular joint marked by a clicking or grinding sensation in the joint and often by pain in or about the ears, muscle tiredness and slight soreness upon waking, and stiffness of the jaw or actual trismus; it results from mandibular overclosure, condylar displacement, or stress, with deforming arthritis an occasional factor.

*Bocalbos v. Kapiolani Med. Center for Women & Children*, 93 Hawai'i 116, 118, 997 P.2d 42, 44 (2000) (quoting Richard Sloane, *The Sloane–Dorland Annotated Medical–Legal Dictionary* 696 (West 1987)).

On or around February 12, 1997, Dr. Nakashima submitted a PPD rating for Cabatbat's TMJ injury.[3] Dr. Nakashima rated Cabatbat's permanent impairment for his TMJ condition at twenty-three percent of the whole person. In reaching his rating, Dr. Nakashima relied upon the "Recommended Guide to the Evaluation of Permanent Impairment of the Temporomandibular Joint"[4] [hereinafter, Recommended Guide], and the AMA Guides.[5]

On June 4, 1997, the County made a PPD rating examination appointment for Cabatbat with Dentist Henry Hammer. Dr. Hammer concluded that it would be premature to determine Cabatbat's PPD at that time. Cabatbat continued to receive treatment from Dr. Nakashima. On November 12, 1997, Dr. Nakashima's second TMJ rating report was filed with the DCD. *See supra* note 5. Again, Dr. Nakashima determined that Cabatbat's TMJ injury resulted in a twenty-three percent PPD rating.[6]

Thereafter, the County requested that Cabatbat undergo an independent medical examination by Dentist Todd Tasaki for the

TMJ condition. In his report dated June 1, 1998, Dr. Tasaki rendered a rating of eighteen percent PPD. Dr. Tasaki's rating was based on Cabatbat's TMJ range of motion restriction as well as dietary restrictions such as the avoidance of "hard" foods.

The County subsequently requested a clarification of the rating provided by Dr. Tasaki, asking that he limit his consideration to the guidelines set forth by the AMA Guides, Fourth Edition (1993). The County specifically requested that Dr. Tasaki limit his rating evaluation to the guidelines indicated on page 231, § 9.3, Mastication and Deglutition Table 6 of the AMA Guides (Fourth Edition). Table 6 of § 9.3 allows for an impairment rating of between five and nineteen percent for a diet limited to semisolid or soft foods.

On September 30, 1998, Dr. Tasaki provided an impairment rating of between six and eight percent of the whole person for Cabatbat's TMJ injury based on the AMA Guides, as designated by the County. However, Dr. Tasaki indicated that the AMA Guides alone did not provide an adequate basis for assessing Cabatbat's impairment[7]:

---

3. Dr. Nakashima's TMJ rating report does not contain a date; however, Cabatbat's attorney transmitted this report to the DCD on February 14, 1997. On the fax cover sheet, the date of the TMJ rating report is stated as February 12, 1997.

4. Douglas J. Phillips, Jr. D.D.S., at al., 7 *Journal of Craniomandibular Practice* 13 (1989).

5. Both Cabatbat and the County indicate in their opening and answering briefs that Dr. Nakashima relied upon the Recommended Guide and the "American Academy of Head, Facial, Neck Pain and TMJ Orthopedics." However, in a letter dated March 10, 1997 addressed to the DCD, Dr. Nakashima wrote that he relied upon the Recommended Guide and the AMA Guides. In a second TMJ rating report dated November 12, 1997, Dr. Nakashima again determined that Cabatbat's permanent impairment for his TMJ injury was twenty-three percent of the whole person. In this second report, Dr. Nakashima indicated that he based his conclusions upon the Recommended Guide and the "American Academy of Head, Facial, Neck Pain and TMJ Orthopedics" [hereinafter, American Academy].

Cabatbat's opening brief refers to the American Academy as a guide; the County's answering brief does not use the term "guide." It is unclear from the record whether the American Academy title refers to a guide; also, it is unclear whether it differs from the Recommended Guide, which was written by the American Academy

committee on permanent impairment. The Recommended Guide and the guide for permanent impairment established by the American Academy appear to be one and the same. In any event, for the purposes of this opinion, we refer to the Recommended Guide.

6. In Dr. Nakashima's February 12, 1997 TMJ rating report, he indicated a six percent rating for Cabatbat's inability to eat hard foods. In the November 12, 1997 TMJ rating report, Dr. Nakashima indicated a five percent rating for the effect the TMJ had on Cabatbat's diet.

7. Dr. Tasaki did not identify the use of any guide when he determined Cabatbat's impairment rating to be eighteen percent; however, Dr. Tasaki did note that TMJ disorders can be rated using the same criteria the AMA Guides use for other joint disorders.

In this connection, the preface to the Recommended Guide states that it "used the same values [that the AMA Guides use[ ] . . . for other disk-protected and functional joints." It is apparent that the Recommended Guide uses the same criteria that the AMA Guides use to rate other joint disorders. Thus, it appears that Dr. Tasaki determined Cabatbat's impairment rating to be eighteen percent by relying on the same or similar criteria that the AMA Guides employ to evaluate all joint disorders except for TMJ disorders.

*The AMA Guides inappropriately restrict[ ] impairment rating with regard to temporomandibular disorders* (TMD) solely to consistency of food one is able to chew. In many cases, this is an inaccurate assessment of a patient's TMD impairment. In fact, *in the AMA Guides, the [TMJ] and [TMD] in general are not rated in the same manner as other major joints of the body even though the same criteria for rating can be applied to the [TMJ].* For this reason, *I do not recommend sole use of the AMA Guides.* Throughout the AMA Guides, for any other joint in the body, one [can] find criteria for rating such as limitation of range of motion, changes to the osseous or soft tissues within the joint, improper meniscus or disc relationship. . . . Again, these are all criteria which can be applied to impairment related to TMD. This kind of inequity and inconsistency makes pure reliance on the AMA Guides inappropriate in a large number of TMD cases. . . . In conclusion, while there are times that the AMA Guides provide[ ] a fair assessment for rating a[TMD], *in Mr. Cabatbat's case, the condition within the joint (left TMJ) and jaw muscles and the long term impact on his life is not adequately assessed using the AMA Guides. I stand by my previous impairment rating of [eighteen] percent of the whole person for the TMD condition.*

(Emphases added.)

On October 2, 1998, Dr. Nakashima submitted a letter which stated that his rating of Cabatbat's TMJ injury was determined using the "guide for permanent impairment established by the American Academy of Head Neck Facial Pain and Orthopedics. It also takes into consideration the AMA Guide[s] for permanent impairment. *This is the most widely used method in dentistry for determining jaw joint permanent impairment."* [8] (Emphasis added.)

On October 2, 1998, a hearing was held before the DCD to determine Cabatbat's temporary total disability (TTD) and PPD. On December 4, 1998, the DCD awarded Cabatbat $394.21 in TTD and $12,005.76 in PPD. The DCD determined Cabatbat's PPD rating to be eight percent of the whole person, based upon the AMA Guides.[9] On December 8, 1998, Cabatbat filed a request for reconsideration by the DCD and, alternatively, an appeal and notice of appeal of the December 4, 1998 DCD decision to the Board.

Reconsideration of the decision was denied. Cabatbat's sole issue on appeal to the Board was whether the DCD erred by relying on the AMA Guides rather than the Recommended Guide to determine Cabatbat's PPD rating. Cabatbat argued that the DCD should have found his PPD rating to be eighteen percent. Both parties agreed to waive an evidentiary hearing and to submit the matter on the record and on position memoranda.

On July 2, 1999, Dr. Nakashima dispatched a letter to Cabatbat's attorney, who in turn transmitted it to the Board, stating that he did not disagree with Dr. Tasaki's PPD rating of eighteen percent. Before the Board issued a decision and order, Cabatbat's attorney arranged to have Dentist Armand Kainoa Chong review the record. On September 13, 1999, Dr. Chong concluded that he

8. As noted, Dr. Nakashima states that the guide established by the American Academy takes the AMA Guides into consideration. The Recommended Guide states in its preface that it uses the same values that the AMA Guides use to rate joint impairments. *See supra* note 5.

9. In a letter dated August 8, 1998, the DCD wrote to Cabatbat's attorney to discuss the use of the AMA Guides. The letter indicated some apparent inconsistency in the use of guides:

[W]e discussed the ratings received from Dr. Nakashima and Dr. Tasaki and *we could not agree on whether the American Academy of Head, Facial, Neck Pain and TMJ Orthopedic guide was accepted by the Department of Labor to determine TMJ PPD. . . . You . . . indicated*

*that the Department of Labor does accept this guide and you previously sent our office a copy of a decision on a 1986 claim wherein other guides were considered.* As a reminder, I advised you that to my knowledge the Department of Labor only recognizes the AMA Guides to the Evaluation of Permanent Impairment, 4th Edition and Dr. Nakashima's rating is not valid since he considered another guide as a basis for his rating. Secondly, I advised you that I will be sending Dr. Tasaki a letter for further clarification as to how he arrived at his rating utilizing only the AMA Guides, 4th Edition.

(Emphasis added.)

agreed with both of the PPD rating percentages arrived at by Dr. Tasaki and Dr. Nakashima.[10] Dr. Chong further noted that "[t]hese percentages were determined by using the guide for permanent impairment established by the American Academy of Head Neck Facial Pain and Orthopedics, which is the most widely used method for determining permanent impairment for the TMJ. The [AMA] Guides for Permanent Impairment were also taken into consideration." Dr. Chong went on to discuss the inadequacy of the AMA Guides by commenting that

> there are a couple of important things to note, regarding the [AMA] Guides. *The [AMA] Guides ... make[ ] clear that [they] have limitations.... The Guides also state that [they are] not the sole basis for a PPD rating.* ... The methodology using the Guide for permanent impairment established by the American Academy of Head Neck Facial Pain and Orthopedics is much more defined and practical.

(Emphasis added.) Cabatbat provided Dr. Chong's opinion to the Board on September 16, 1999.

On October 4, 2000, the Board issued its decision and order affirming the DCD rating of eight percent PPD. The Board's only conclusion of law was that "[Cabatbat] sustained an eight percent permanent disability of the whole person for the TMJ condition sustained on January 25, 1994." The Board stated that it based its "conclusion on the rating by Dr. Tasaki using the AMA Guides."

## II.

On October 24, 2000, Cabatbat appealed the Board's October 4, 2000 decision and order to this court. He contends (1) that the Board erred in its determination that Cabatbat's impairment rating for the TMJ injury be limited to the AMA Guides and (2) that the Board erred in its determination that Cabatbat sustained an eight percent permanent disability of the whole person for his TMJ injury.

We review agency decisions based on the standards set forth in Hawai'i Revised Statutes (HRS) § 91–14(g) (1993).[11] This court applies a clearly erroneous standard of review to the Board's findings. "[A]ppeals taken from findings set forth in decisions of the Board are reviewed under the clearly erroneous standard. Thus, the court considers whether such a finding is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." *Bocalbos,* 93 Hawai'i at 124, 997 P.2d at 50 (citations, internal quotation marks, brackets, ellipses, and emphasis omitted). "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is left with the definite and firm conviction that a mistake has been made." *Id.* (citation and internal quotation marks omitted). Additionally, the Board's "conclusions of law ... are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law." *Poe v. Hawai'i Labor Relations Bd.,* 87 Hawai'i 191, 195, 953 P.2d 569, 573 (1998).

## III.

In connection with Cabatbat's first point, HAR Title 12, Subtitle 3, Chapter 10,

---

10. Dr. Tasaki determined Cabatbat's PPD rating to be eighteen percent. Dr. Nakashima determined Cabatbat's PPD rating to be twenty three percent. Dr. Nakashima noted that Dr. Tasaki's PPD rating was "pretty close" to his own; thus, Dr. Nakashima did not disagree with Dr. Tasaki's PPD rating of eighteen percent.

11. HRS § 91–14, entitled "Judicial review of contested cases," provides in part as follows:
      (g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the

administrative findings, conclusions, decisions, or order are:
   (1) In violation of constitution or statutory provisions; or
   (2) In excess of the statutory authority or jurisdiction of the agency; or
   (3) Made upon unlawful procedure; or
   (4) Affected by other error of law; or
   (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
   (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Subchapter 2, § 12–10–21, entitled "Disabilities," states, in relevant part that "[i]mpairment rating guides issued by the American Medical Association, American Academy of Orthopedic Surgeons, and any other such guides which the director deems appropriate and proper *may be used as a reference or guide* in measuring a disability." [12] (Emphasis added.) "The general principles of construction which apply to statutes also apply to administrative rules. As in statutory construction, courts look first at an administrative rule's language." *Int'l Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co.*, 68 Haw. 316, 323, 713 P.2d 943, 950 (1986) (citing 1A *Sutherland Statutory Construction* §§ 31.06 at 532 (4th ed. 1985 Rev.); *Kaiama v. Aguilar*, 67 Haw. 549, 553, 696 P.2d 839, 842 (1985)); *see also Brown v. Thompson*, 91 Hawai'i 1, 9, 979 P.2d 586, 594 (1999). Thus, because an "interpretation of a statute is . . . a question of law reviewable de novo, under the right/wrong standard," *Bank of Hawai'i v. DeYoung*, 92 Hawai'i 347, 351, 992 P.2d 42, 46 (2000), the interpretation of a rule presents a question of law. We review the Board's interpretation of HAR § 12–10–21, then, under the right/wrong standard.

HAR § 12–10–21, by its terms, provides that the AMA Guides *may* be used to determine impairment ratings. HAR § 12–10–21 goes on to state that "an employee *shall* be deemed totally disabled" if the employee is unable to complete a regular daily shift due to an injury.[13] (Emphasis added.) In this context,

> this court has subscribed to the proposition that *where the verbs "shall" and "may" are used in the same statute*, especially where they are used in close juxtaposition, we should infer that *the legislature realized the difference in meaning and intended that the verbs used should carry with them their ordinary meanings.*

---

**12.** HAR § 12–10–21, entitled "Disabilities," states in its entirety:

> (a) Impairment rating guides issued by the American Medical Association, American Academy of Orthopedic Surgeons, and any other such guides which the director deems appropriate and proper *may* be used as a reference or guide in measuring a disability.

*Gray v. Admin. Dir. of the Court, State of Hawai'i*, 84 Hawai'i 138, 149, 931 P.2d 580, 591 (1997) (citation, internal quotation marks, and brackets omitted) (emphases added); *see also Krystoff v. Kalama Land Co.*, 88 Hawai'i 209, 214, 965 P.2d 142, 147 (1998). Thus, "the close proximity of the contrasting verbs 'may' and 'shall' requires a *non-mandatory*, i.e. a discretionary, construction of the term 'may,'" *Gray*, 84 Hawai'i at 149, 931 P.2d at 591. Therefore, HAR § 12–10–21, which states that the AMA Guides *may* be used as a reference, permits reliance on the AMA Guides, but does not mandate their use to the exclusion of other appropriate guides.

The Board, however, construed HAR § 12–10–21 to require the use of the AMA Guides only. In rejecting the ratings determined pursuant to the Recommended Guide, the Board gave weight only to the AMA Guides, to the exclusion of all other guides. *See* discussion *supra* Part I. But, correctly construed, HAR § 12–10–21 does not preclude the use of guides other than the AMA Guides. Thus, the Board's construction of HAR § 12–10–21 was wrong.

## IV.

Moreover, a restrictive interpretation of HAR §. 12–10–21 runs afoul of the liberal construction to be afforded the provisions of HRS chapter 386 (1993 & Supp.2002).[14] In *Respicio v. Waialua Sugar Co.*, 67 Haw. 16, 675 P.2d 770 (1984), this court observed that "Hawai'i's workers' compensation statute is to be accorded beneficent and liberal construction in favor of the employee, to fulfill the humanitarian purposes for which it was enacted." *Id.* at 18, 675 P.2d at 772. Such a policy has been in effect since the early twentieth century. See *Davenport v. City & County of Honolulu*, 100 Hawai'i 481, 491, 60 P.3d 882, 892 (2002) ("It is well-established in

> (b) If an employee is unable to complete a regular daily work shift on account of a work injury, the employee *shall* be deemed totally disabled for that day.

(Emphases added.)

**13.** *See supra* note 12.

**14.** HRS Chapter 386 is Hawai'i's Workers' Compensation Law.

Hawai'i that chapter 386 is social legislation that is to be interpreted broadly."); *Shipley v. Ala Moana Hotel,* 83 Hawai'i 361, 365, 926 P.2d 1284, 1288 (1996) ("[W]orkers' compensation laws should be liberally construed in order to accomplish the intended beneficial purposes of the statute."); *Silva v. Kaiwiki Milling Co.,* 24 Haw. 324, 329 (Terr.1918) ("Compensation acts being highly remedial in character, though in derogation of the common law, should generally be liberally and broadly construed to effectuate their beneficent purposes.").

HAR § 12–10–21 is promulgated pursuant to HRS § 386–72 (1993). HRS § 386–72 authorizes the director of the department of labor and industrial relations (director) to adopt rules and provides that, "[i]n conformity with and subject to chapter 91, the [director] shall make rules, *not inconsistent with this chapter,* which the director deems necessary for or conducive to its proper application and enforcement." (Emphasis added.) Hence, HAR § 12–10–21 may not conflict with the provisions of HRS chapter 386.

In that regard, HRS § 386–3 (1993 & Supp.2002) provides that, "[i]f an employee suffers personal injury ... in the course of the employment, ... the employee's employer ... *shall pay compensation* to the employee[.]" (Emphasis added.) Pursuant to HRS § 386–32 (1993 & Supp.2002), "[w]here a work injury causes permanent partial disability, the employer *shall pay* the injured worker *compensation* in an amount" computed under HRS § 386–32. (Emphasis added.) Under HRS § 386–71 (1993), the director must "take all measures necessary for[ ] the prompt and *proper payment of compensation.*" (Emphasis added.)

Under the foregoing provisions, payment of benefits which fails to properly compensate an injured worker would be antithetical to a liberal and broad construction which was meant to effectuate the law's beneficent purposes. Under the circumstances of this case as discussed herein, a restrictive application of HAR § 12–10–21 would result in inadequate compensation and render HAR § 12–10–21 inconsistent with HRS chapter 386.

15. *See supra* note 5.

V.

■ Given a proper reading of HAR § 12–10–21, the Board's decision to rely solely upon a part of the AMA Guides for the disability rating was clearly erroneous in view of the reliable, probative, and substantial evidence on the record. *See* HRS § 91–14(g)(5).

The Board made the following relevant findings of fact (findings):

6. The record contains two undated TMJ impairment ratings by Dr. Nakashima. Both of these ratings placed [Cabatbat's] permanent impairment for his TMJ condition at twenty-three percent of the whole person. Dr. Nakashima used two guides, the Recommended Guide to the Evaluation of Permanent Impairment of the Temporomandibular Joint ("Recommended Guide") and the American Academy of Head, Facial, Neck Pain and TMJ Orthopedics, to rate [Cabatbat's] permanent impairment.[15]

7. [Cabatbat] was also rated by Dr. Todd Tasaki, a dentist, on June 1, 1998. Dr. Tasaki rated [Cabatbat's] permanent impairment for his TMJ disorder at eighteen percent of the whole person. Dr. Tasaki based his June 1 rating on range of motion restriction, as well as, diet restricted to avoidance of hard foods.

8. When asked by [the] Employer in September 1998, to rate [Cabatbat's] permanent impairment using the AMA Guides, Dr. Tasaki rated [Cabatbat's] impairment at six to eight percent of the whole person based on dietary restrictions. This section of the AMA Guides allows a range of five percent to nineteen percent impairment of the whole person when diet is limited to semisolid or soft foods. Under the AMA Guides, dietary restrictions are considered to be the most objective criteria by which to evaluate permanent impairment. The AMA Guides further allow other effects of the TMJ

condition to be considered in conjunction with parts of the AMA Guides that deal with the nervous system or pain. *We credit Dr. Tasaki's rating done under the AMA Guides.*

(Emphasis added.)

## VI.

Initially, we note that Drs. Nakashima and Tasaki did consider the AMA Guides in their evaluation of Cabatbat's impairment. In contrast to the Board's findings, the evidence on the record demonstrates that Dr. Nakashima did rely in part on the AMA Guides in evaluating Cabatbat's impairment. Dr. Nakashima related that his rating of Cabatbat's TMJ injury was determined using the "guide for permanent impairment established by the American Academy of Head Neck Facial Pain and Orthopedics. *It also takes into consideration the AMA Guide[s] for permanent impairment.*" (Emphasis added.)

Dr. Tasaki asserted that the AMA Guides do not rate TMJ disorders in the same manner that other joint disorders are rated. Dr. Tasaki reasoned that TMJ disorders could be rated by applying the same criteria used within the AMA Guides to rate other joint disorders. Thus, Dr. Tasaki also relied in part upon the AMA Guides' standards for rating impairments caused by joint disorders. *See supra* note 7.

Additionally, Dr. Chong concluded that Cabatbat's impairment rating was "determined by using the guide for permanent impairment established by the American Academy of Head Neck Facial Pain and Orthopedics[.] ... *The [AMA] Guides for Permanent Impairment were also taken into consideration.*" (Emphasis added.)

## VII.

The Board also erred in relying solely on the AMA Guides because the AMA Guides themselves instruct that they should not be the only factor considered in assessing impairments. The AMA Guides state that

[i]t should be understood that the Guides do[ ] not and cannot provide answers about every type and degree of impairment.... *The physician's judgment and his or her experience, training, skill, and thoroughness in examining the patient* and applying the findings to *Guides'* criteria *will be factors* in estimating the degree of the patient's impairment.

AMA Guides at 3 (emphases added). Thus, the AMA Guides direct that the physician's judgment is a factor to be considered when determining an impairment rating. The County's independent expert, Dr. Tasaki, specifically declared that the AMA Guides inadequately addressed impairments that resulted from TMJ disorders. *See* discussion *supra* Part I. Dr. Chong pointed out the limiting language in the AMA Guides. *See* discussion *supra* Part I. All three dentists judged the AMA Guides to be inadequate in evaluating TMJ impairments; yet, the Board failed to consider their judgments as factors in determining Cabatbat's PPD rating.

The AMA Guides further emphasize that "impairment percentages derived according to *Guides* criteria should not be used to make direct financial awards or direct estimates of disabilities." AMA Guides at 5.[16] The AMA Guides caution that disability determinations should not be based solely on the Guides; however, the Board relied exclusively upon an impairment rating "derived according to the Guides criteria," despite this limiting language. *Id.*

In *In re Wal–Mart Stores,* 145 N.H. 635, 765 A.2d 168 (2000), the Supreme Court of New Hampshire held that the compensation appeals board properly deviated from the AMA Guides to accurately evaluate the respondent's impairment. *Id.* at 172. In that case, the court observed that New Hampshire's workers' compensation statute speci-

---

**16.** The DCD and the Board relied upon the Fourth edition of the AMA Guides in this case. *See supra* note 9. The fifth edition of the AMA Guides was not in effect at the time of this case; however, the fifth edition does reiterate that "the Guides [are] not to be used for direct financial awards *nor as the sole measure of disability.* The *Guides* provide[ ] a standard medical assessment for impairment determination and *may be used as a component* in disability assessment." American Medical Association, *Guides to the Evaluation of Permanent Impairment* 12 (5th ed., AMA 2001) (emphases added).

fied that the AMA Guides were to be used in determining permanent impairment. *Id.* However, the court explained that "[t]he *AMA Guides* expressly allow[ ] a physician to deviate from the guidelines if the physician finds it necessary to produce an impairment rating more accurate than the recommended formula can achieve." *Id.* (quoting *Appeal of Rainville*, 143 N.H. 624, 732 A.2d 406, 412 (1999) ("[the AMA Guides] do[ ] not and cannot provide answers about every type and degree of impairment because of the infinite variety of human disease, and the constantly evolving field of medicine, and the complex process of human functioning" (quoting the AMA Guides, Fourth Edition (1993), at 3)).

Similarly, in *Slover Masonry, Inc. v. Indus. Comm'n of Arizona*, 158 Ariz. 131, 761 P.2d 1035 (1988), the Arizona Supreme Court held that an administrative law judge (ALJ) is not bound to follow the AMA Guides as the sole measure of impairment. *Id.* at 1036. The court reasoned that the "ALJ must consider *all competent and relevant evidence* in establishing an accurate rating of functional impairment, even if a medical expert asserts that the AMA Guides are perfectly adequate to measure loss of motion." *Id.* at 1040 (emphasis added). The court acknowledged that

> [t]he AMA Guides are only a tool adopted by administrative regulation to assist in ascertaining an injured worker's percentage of disability. Thus, *where the AMA Guides do not truly reflect a claimant's loss, the ALJ must use his discretion to hear additional evidence and, from the whole record, establish a rating independent of the AMA recommendations.*

*Id.* (emphasis added).

According to the AMA Guides and Drs. Nakashima, Tasaki, and Chong, the Board should not have relied solely upon the AMA Guides to evaluate Cabatbat's TMJ injury. Under the circumstances, the AMA Guides would "not truly reflect" Cabatbat's TMJ impairment. *Id.*

## VIII.

The Board stated in its findings that "[t]he authors [of the Recommended Guide] sought to have the Recommended Guide endorsed by the AMA and to have it included in the Fourth Edition of the AMA Guides. It was not included as the most objective criteria to evaluate permanent impairment." The Board cites no source or authority for this statement, and none is evident in the record. Hence there is no reliable, probative, or substantial evidence in the record to support this statement.

The Board also found that "[t]he AMA Guides further allow other effects of the TMJ condition to be considered in conjunction with parts of the AMA Guides that deal with the nervous system or pain." In the same vein, the County argues that Drs. Nakashima, Tasaki, and Chong failed to consider "the effects of the TMJ condition with parts of the AMA Guides that deal with the nervous system or pain." However, the DCD restricted Dr. Tasaki's analysis to § 9.3, Table 6 of the AMA Guides. *See supra* page 5. As previously mentioned, this table allows for an impairment rating of TMJ disorders based only on dietary restrictions. Thus, it is incongruous for the Board to suggest or the County to argue that the dentists could have provided ratings that took into consideration the nervous system or pain, when the DCD specifically limited the impairment rating analysis to § 9.3, Table 6 of the AMA Guides.

## IX.

On the other hand, all three dentists believed that Cabatbat's TMJ injury should have been assessed according to criteria such as those found in the Recommended Guide. As Drs. Nakashima and Chong noted, the Recommended Guide is "the most widely used method in dentistry for determining jaw joint permanent impairment."[17] The Board

---

17. To reiterate, Dr. Nakashima stated that [t]he rating percentage for [Cabatbat] was determined using the guide for permanent impairment established by the American Academy of Head Neck Facial Pain and Orthopedics. It also takes into consideration the AMA Guide for permanent impairment. This is the most widely used method in dentistry for determining jaw joint permanent impairment.

**10**

therefore erred when it disregarded the reports applying the criteria found in the Recommended Guide.

## X.

In conclusion, neither HAR § 12–10–21, nor the AMA Guides mandate that impairment ratings be determined solely based upon the AMA Guides. The Board's interpretation of HAR § 12–10–21 was wrong. The requirement to use a part of the AMA Guides, to the exclusion of the Recommended Guide, under the circumstances of this case, would violate HRS chapter 386. Finally, there is reliable, probative, and substantial

As previously noted, Dr. Chong agreed with the rating percentages arrived at by Drs. Tasaki and Nakashima, and noted that "[t]hese percentages were determined by using the guide for permanent impairment established by the American Academy of Head Neck Facial Pain and Orthope-

evidence on the record that the Recommended Guide appropriately addressed Cabatbat's TMJ impairment. For the foregoing reasons, the October 4, 2000 decision and order of the Board is vacated, and the case remanded for a redetermination of Cabatbat's PPD rating.

dics, which is the most widely used method for determining permanent impairment for the TMJ."