Electronically Filed
Supreme Court
SCWC-12-0000398
13-OCT-2017
09:47 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

DENNIS T. IHARA,
Petitioner/Claimant-Appellee, Cross-Appellant,

vs.

STATE OF HAWAI'I, DEPARTMENT OF LAND AND NATURAL RESOURCES
Respondent/Employer-Appellant, Cross-Appellee, Self-Insured.

SCWC-12-0000398

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000398; CASE NO. AB 2008-266 (2-07-40277))

OCTOBER 13, 2017

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY WILSON, J.

## I.   INTRODUCTION

This case raises two questions concerning the law of workers' compensation in Hawai'i as it relates to permanent partial disability (PPD) awards.  First, must a PPD award for an

unscheduled injury that is not comparable to a scheduled injury

be supported by some factual finding of a determinate percentage

of impairment of a physical or mental function of the whole

person?  This question relates to a required component in the way

the PPD award for such an injury must be calculated under HRS §

386-32(a).[1]  Second, may a PPD determination be based on a

claimant's post-injury inability (or reduced ability) to perform

the usual and customary work activities in the position the

---

[1]     HRS § 386-32(a) states:

    Permanent partial disability.  Where a work
injury causes permanent partial disability, the employer
shall pay the injured worker compensation in an amount
determined by multiplying the effective maximum weekly
benefit rate prescribed in section 386-31 by the number of
weeks specified for the disability as follows:

    .  .  .

    Other cases.  In all other cases of permanent
partial disability resulting from the loss or loss of use of
a part of the body or from the impairment of any physical
function, weekly benefits shall be paid at the rate and
subject to the limitations specified in this subsection for
a period that bears the same relation to a period named in
the schedule as the disability sustained bears <u>to a
comparable disability</u> named in the schedule.  <u>In cases in
which the permanent partial disability must be rated as a
percentage of the total loss or impairment of a physical or
mental function of the whole person, the maximum
compensation shall be computed on the basis of the
corresponding percentage of the product of three hundred
twelve times the effective maximum weekly benefit rate
prescribed in section 386-31</u>.  (Emphasis added.)

claimant occupied prior to the injury?[2]  This question relates to the range of permissible methods by which the degree of partial impairment may be assessed.  With the qualifications detailed below, we answer both questions in the affirmative.

## II.  BACKGROUND

In March, 2012, the Labor and Industrial Relations Appeals Board (the LIRAB or the Board) awarded Ihara $250 in permanent partial disability (PPD) benefits and found the Department of Land and Natural Resources (DLNR) liable for vocational rehabilitation services.  Both Ihara and DLNR appealed to the Intermediate Court of Appeals (ICA).  The ICA vacated the LIRAB's award of $250 in PPD and related vocational rehabilitation services, and it remanded to the LIRAB for further proceedings.  On certiorari, Ihara seeks reversal of the ICA's decision to vacate the LIRAB's award of permanent partial disability benefits to Ihara.  Ihara contends the ICA erred in holding that (1) the LIRAB was required to calculate the award based on a percentage-based finding of impairment, and (2) that

---

[2]  We consider only the issues raised by Ihara in his application for writ of certiorari.  His application presented three questions: Did the ICA gravely err in ruling that a PPD award requires a finding of some mental or physical impairment?  Did the ICA gravely err in ruling that PPD must equal impairment?  Did the ICA gravely err in ruling that PPD should not be based on a claimant's ability to work?  We reformulate his first question more precisely above; we combine his second and third questions in the discussion below.

the LIRAB erred when it considered work activities in determining Ihara's PPD award.

## A. Ihara's employment and injury

Ihara was employed as a Deputy Registrar at the Bureau of Conveyances, a division within DLNR. Although he was a Deputy Registrar, Ihara was in charge of operations for the Bureau of Conveyances and effectively performed the duties of the Registrar. Ihara described the Bureau as being in a state of "disarray and dysfunction," explaining that "the Land Court section staff was pitted against the Regular System section staff." Job stress caused Ihara to experience trouble sleeping, memory lapses, anxiety, and depression.

Ihara reported to DLNR that he suffered increased hypertension and stress resulting from the pressures of his position, and that this injury occurred on approximately February 1, 2007. On March 21, 2007, DLNR filed a Form WC-1: Employer's Report of Industrial Injury, which documented Ihara's claim and the nature of his injury, and on May 17, 2007, Ihara filed a Form WC-5: Employee's Claim for Worker's Compensation Benefits. Ihara's physician, Dr. Ronald A. Morton, submitted a letter stating that Ihara was in reasonably good health with controlled hypertension, but that high work stress had caused a

recent and marked elevation in his blood pressure.

At the request of DLNR, Dr. Ajit Arora performed an Independent Medical Examination and Dr. Jon Streltzer performed an Independent Psychiatric Examination on Ihara. Dr. Arora's report from May 21, 2007 diagnosed Ihara with "[e]ssential hypertension, genetically based, with temporary aggravation." Dr. Streltzer's report from June 19, 2007 stated that Ihara suffered from "Adjustment Disorder with Anxiety, Primary Insomnia, Occupational Problem (not a mental disorder), and High Blood Pressure." Based on Dr. Arora's and Dr. Streltzer's Independent Medical Examination and Independent Psychiatric Evaluation, DLNR accepted compensability for Ihara's claim as a temporary aggravation.

The Department of Human Resources Development, Employee Claims Division, instructed the doctors to submit reports and statements to the Department of Human Resources Development, State Workers' Compensation Division, documenting the medical services rendered in relation to his increased stress and hypertension. Various notes from Dr. Morton were submitted, as well as from psychiatrist Dr. Dennis Lind, excusing Ihara from work and stating that he was disabled for certain dates. Ihara was put on unpaid medical leave with his last day at work being

June 12, 2007.

On June 19, 2008 the claims manager of the Employee Claims Division wrote to Drs. Lind and Morton requesting their opinions as to whether Ihara could return to work.  On June 25, 2008, Dr. Lind responded that Ihara had reached medical stability and could work in other situations, but not at DLNR.  Dr. Morton wrote on June 27, 2008 that Ihara could return to regular duty and had reached medical stability.

Based on Dr. Lind's assessment that Ihara had reached medical stability but could only work in other situations, DLNR discharged Ihara from his position at the Bureau of Conveyances via a letter dated July 11, 2008.  Relying on Dr. Lind's "medical assessment," DLNR determined that Ihara was "medically disqualified for continued civil service employment," not only for the Deputy Registrar position but also for "any DLNR employment."

**B.  Hearings before the Department of Labor and Industrial Relations and the LIRAB**

Ihara claimed eligibility for temporary total disability benefits and vocational rehabilitation services. Ihara's employer, DLNR, disputed his eligibility for some of those benefits and services.  Disputes concerning benefits are

decided by the director of the Department of Labor and Industrial Relations. HRS § 386-86(a)-(b)(1993 & Supp. 2014). The director conducts an informal hearing on the claim and issues findings of fact and conclusions of law. Id. After an initial hearing in March 2008 and a decision in May 2008, the director, in a supplemental decision in October 2009, stated that DLNR was required to pay Ihara for "such medical care, services and supplies as the nature of the injury may require," as well as weekly compensation for Ihara's temporary total disability and temporary partial disability for the relevant weeks of his leave. In addition, the director found that no permanent disability resulted from Ihara's injury. Both Ihara and DLNR appealed the decision to the LIRAB.

In its March 13, 2012 decision and order, the Board found that Ihara was entitled to certain periods of temporary total disability as a result of his work injury and to vocational rehabilitation benefits for certain periods. The Board concluded that Ihara was entitled to benefits for permanent partial disability in the amount of $250 based on its finding that the DLNR's statement in its July 11, 2008 letter that Ihara was medically disqualified from his position served as an admission that Ihara was permanently disabled.

7

> The Board finds that Employer's statement that Claimant was "medically disqualified" for his position was an admission or acknowledgement that Claimant was permanently disabled. The Board finds this to be especially so, because Employer sought out and received opinions of medical stability from Drs. Morton and Lind before it sent this letter.
>
> The Board credits the opinions that Claimant sustained no ratable impairment. However, Employer's July 11, 2008 letter admitted or acknowledged permanent disability, stated that Claimant was "medically disqualified" for his position, and terminated him therefrom. Therefore, the Board finds that Claimant sustained permanent partial disability in the amount of $250.

Both the DLNR and Ihara appealed the LIRAB's decision to the ICA.

## C. ICA proceedings

The ICA vacated the Board's ruling awarding Ihara $250 in PPD benefits on two grounds. First, the ICA held that the statute governing PPD benefits requires the assignment of a percentage of impairment for unscheduled injuries, i.e., for injuries not listed in the statute. More precisely stated, the statute requires the assignment of a percentage of impairment for injuries not specifically listed in the statute or comparable to those listed in the statute. The Board had failed to assign any percentage of impairment to Ihara's injury, instead awarding him a lump sum of $250.

Second, based on its analysis of the statute's legislative history, the ICA held that PPD may not be based on "ability to work," because, unlike total disability awards, PPD benefits are essentially indemnity payments for loss of bodily

8

integrity, not compensation to replace loss of wages.  The ICA found that the Board improperly awarded Ihara permanent partial disability benefits based on his reduced ability to work.  The ICA noted that the Board's award of PPD benefits was based on the ambiguous position that, though Ihara suffered no ratable impairment, nonetheless he was "medically disqualified" to return to his position at DLNR, and the Board accordingly awarded him PPD benefits, based on his reduced ability to work.

The ICA found the Board's position on the extent of Ihara's impairment ambiguous.  Either the Board meant by its findings that Ihara suffered no impairment at all, or it meant "that he had suffered some impairment, but in an amount incapable of being measured."[3]

The ICA vacated the Board's award and remanded "for a determination of whether Ihara had suffered a permanent impairment, and if so, the percentage of the impairment and the award of PPD benefits based on that percentage."[4]

---

[3]     As noted <u>infra</u>, an award of permanent partial disability benefits for an unscheduled injury that is not comparable to a scheduled injury must be based on a finding of a determinate degree or percentage of impairment.

[4]     Vocational rehabilitation services are available for employees who suffer permanent disability.  HRS § 386-25(b)(Supp. 2014). Because the ICA vacated the Board's award of PPD benefits to Ihara, it also vacated the Board's determination that Ihara was entitled to vocational
                                                        (continued...)

### III.   STANDARDS OF REVIEW

**A.  Appeals from agency determinations relating to workers' compensation**

Appellate review of a LIRAB decision is governed by the provisions of the Hawaiʻi Administrative Procedure Act relating to judicial review of agency action.  HRS § 91-14(g)(1993); Bocalbos v. Kapiolani Med. Ctr. for Women & Children, 93 Hawaiʻi 116, 123, 997 P.2d 42, 49 (App. 2000).  Under those provisions, the reviewing court "may affirm the decision of the agency or remand the case with instructions for further proceedings."  Id. The reviewing court also "may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders" (1) violate provisions of the constitution or a statute, (2) are beyond the agency's statutory authority or jurisdiction, (3) used "unlawful procedure," (4) were "[a]ffected by other error of law," (5) were clearly erroneous, or (6) were arbitrary or capricious "or characterized by abuse of discretion or clearly unwarranted exercise of discretion."  HRS § 91-14(g)(1)-(6).  To be reversed as clearly erroneous, the agency's

_____

[4](...continued)
rehabilitation services.  The ICA then remanded that issue to the Board "for a redetermination consistent with its final decision on the PPD issue."

findings, conclusions, decisions or orders must be clearly erroneous "in view of the reliable, probative, and substantial evidence on the whole record." HRS § 91-14(g)(5); Poe v. Hawaiʻi Labor Relations Bd., 87 Hawaiʻi 191, 195, 953 P.2d 569, 573 (1998). As to conclusions of law, the LIRAB's conclusions will be reviewed de novo, under the right/wrong standard. Tate v. GTE Hawaiian Tel. Co., 77 Hawaiʻi 100, 103, 881 P.2d 1246, 1249 (1994). As to findings of fact, an "agency's findings should be 'sufficient to allow the reviewing court to track the steps by which the agency reached its decision.'" Kauai Springs, Inc. v. Planning Comm'n of Cty. of Kauai, 133 Hawaiʻi 141, 164, 324 P.3d 951, 974 (2014)(citation omitted); Int'l Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co., 68 Haw. 316, 328, 713 P.2d 943, 953 (1986)("A remand pursuant to HRS § 91-14(g) is appropriate if an agency's findings are incomplete"). "When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field. The court should not substitute its own judgment for that of the agency." In re Water Use Permit Applications, 94 Hawaiʻi 97, 119, 9 P.3d 409, 431 (2000)(citation, braces, and internal quotation marks omitted).

11

## B. Statutory interpretation

Appellate courts review statutory interpretation de novo. <u>Van Ness v. State, Dep't of Educ.</u>, 131 Hawaiʻi 545, 558, 319 P.3d 464, 477 (2014), <u>as corrected</u> (Feb. 4, 2014). "When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." <u>Id.</u> (citation omitted). The "broad humanitarian purpose of the workers' compensation statute read as a whole requires that all reasonable doubts be resolved in favor of the claimant." <u>Id.</u> (braces, underscoring, and citation omitted). The statute must be "construed . . . liberally" in order to effect its "beneficent purposes." <u>Puchert v. Agsalud</u>, 67 Haw. 25, 36, 677 P.2d 449, 457 (1984).

## IV. DISCUSSION

On certiorari, Ihara raises as issues (1) whether a PPD award for an unscheduled injury requires a finding of some mental or physical impairment and (2) whether a PPD award may reflect a claimant's reduced ability to work. To address these issues, we provide a brief overview of the relevant portions of the workers' compensation statute.

12

## A. Legislative and administrative background of permanent partial disability

Workers' compensation statutes "are highly remedial in character. Their paramount purpose is to provide compensation for an employee for all work-connected injuries, regardless of questions of negligence and proximate cause." Flor v. Holguin, 94 Hawaiʻi 70, 79, 9 P.3d 382, 391, on reconsideration in part, 94 Hawaiʻi 92, 9 P.3d 404 (2000). The Hawaiʻi workers' compensation statute "is social legislation that is to be interpreted broadly." Davenport v. City & Cty. of Honolulu, Honolulu Fire Dep't, 100 Hawaiʻi 481, 491, 60 P.3d 882, 892 (2002). The statute provides "an injured employee's exclusive remedy for an injury arising out of and in the course of employment." Iddings v. Mee-Lee, 82 Hawaiʻi 1, 5, 919 P.2d 263, 267 (1996). In addition, the statute embodies a presumption of compensability, and that "presumption has been described as one of the 'keystone principles' of our workers' compensation plan." Flor, 94 Hawaiʻi at 79, 9 P.3d at 391.

Various benefit categories exist to meet different workers' varied circumstances. Two types of permanent disability are relevant to our discussion here: total disability and permanent partial disability. Total disability benefits

13

compensate a worker for his or her loss of wage-earning capacity, while PPD benefits compensate a worker for the loss of bodily integrity, that is, the loss of a physical or mental function. HRS § 386-31(a); HRS § 386-32(a).  If an employee is injured on the job and is unable to work in any capacity after the injury, he or she is eligible for a total disability benefit.  H. Stand. Comm. Rep. No. 418-70, in 1970 House Journal, at 976.  Total permanent disability payments are wage replacement benefits meant to compensate the worker for the permanent loss of wage-earning capacity where the worker is unable to find work on the regular labor market.  Id.  The purpose of a PPD award, on the other hand, is to compensate a worker for the loss or impairment of a physical or mental function.  Unlike total disability, a PPD award is not based on the amount of wages lost.  H. Stand. Comm. Rep. No. 193, in 1969 House Journal, at 702.  A PPD award is payable to the worker even if the worker returns to work, and the amount of the award derives from the extent of a worker's impairment rather than his or her wage-earning capacity.  See HRS § 386-32(a).

The distinction between total disability and PPD benefits is further clarified in the legislative history of the 1970 amendments to the statute. "'[T]otal disability' is defined

as 'disability of such an extent that the disabled employee has no reasonable prospect of finding regular employment of any kind in the normal labor market.' . . . Permanent partial disability compensation payments under the law, however, are based primarily on impairment of physical or mental function and not on ability for work." H. Stand. Comm. Rep. No. 418-70, in 1970 House Journal, at 976. Thus, the legislature intended that total disability benefits should compensate a worker for wages lost when he or she is unable to find regular employment of any kind due to a work-related injury, whereas PPD benefits should compensate for the loss or impairment of a mental or bodily function, irrespective of wage-earning capabilities.

PPD injuries divide into two basic classes, scheduled and unscheduled. 2 Modern Workers Compensation § 200:10 (Thomson Reuters 2017). Scheduled losses or injuries are those specifically listed and provided for by statute; unscheduled losses or injuries are those not specifically listed. Id. Methods for determining or calculating the amount of compensation for permanent partial injuries differ depending on whether the injury is scheduled or unscheduled. HRS § 386-32(a) illustrates the method for determining the amount of compensation for scheduled injuries. It includes a schedule of body parts whose

loss is covered by permanent partial disability benefits, with the amount of compensation varying based on the specific body part. The schedule lists benefits to be paid for specific losses, e.g., a finger or hand. HRS § 386-32(a).

For loss or impairment of a function that is not listed in the schedule, or is not comparable to a scheduled injury, the permanent partial disability is rated as a percentage of the total loss or impairment of a physical or mental function of the whole person.[5] HRS § 386-32(a). The percentage is used to calculate the dollar amount of the PPD award according to a formula in the statute. HRS § 386-32(a) provides that the "maximum compensation" for an unscheduled PPD injury "<u>shall</u> be computed on the basis of the corresponding percentage . . . ." <u>Id.</u> (emphasis added).

---

[5] The general outline of this "degree of whole person impairment" approach has been described as follows.

> Under the impairment of the whole person method of computing workers' compensation for a permanent partial disability, the calculation of the workers' compensation payable is the result of a multiplication. The multiplicand is the amount which the statute assigns to the whole person. This may be a flat dollar amount or a number of weeks or months of compensation . . . with the per-week compensation figured as a fraction or percentage of the employee's pre-injury average weekly wages or earnings or the statewide average weekly wage. The multiplier is the proportion, fraction, percentage or degree (figured up to 100 degrees) of the employee's impairment.

2 Modern Workers Compensation § 200:18.

16

In practice, initial PPD ratings for unscheduled injuries are typically provided by medical experts using rating categories outlined in the various editions of the American Medical Association's Guides to the Evaluation of Permanent Impairment (AMA Guides), and then the LIRAB may add additional percentage points depending on the magnitude of the impairment rating.  See Hawaiʻi Administrative Rules (HAR) § 12-10-21(a)("Impairment rating guides issued by the American Medical Association, American Academy of Orthopedic Surgeons, and any other such guides which the director deems appropriate and proper may be used as a reference or guide in measuring a disability."). See also Ibarra v. Fireman's Fund Ins. Co., Case No. AB 2009-504 (2-06-01173); Chi v. City & Cty. of Honolulu, Case No. AB 2006-116 (2-04-01998).

It is, however, ultimately the director of the Department of Labor and Industrial Relations or the Board, and not the physician, that decides the final PPD rating.  Cabatbat v. Cty of Hawaiʻi, Dep't of Water Supply, 103 Hawaiʻi 1, 9, 78 P.3d 756, 764 (2003), as corrected (Dec. 8, 2003).  The LIRAB generally places great weight upon a physician's initial impairment rating, but it is not the only component of the Board's assessment.  Id.  The LIRAB's decisions show a marked

17

pattern in which the Board considers factors other than the physician's impairment rating, such as whether the complainant is able to participate in the same types of hobbies and daily and work activities as prior to the accident.  See, e.g., Belanio v. State, Case No. AB 2007-532 (1-03-10259) at 8 (claimant's inability to return to customary job resulted in 3% PPD); Deponte v. City & Cty. of Honolulu, Case No. AB 97-624 (2-95-11372) at 3-4 (claimant's inability to perform activities of daily living resulted in 2% PPD); Chi, AB 2006-116 at 3 (claimant awarded 3% PPD due to inability to engage in recreational and daily living activities).

Disputes concerning compensation under Hawaii's workers' compensation law are decided by the director.  HRS § 386-86(a)-(b).  The director conducts an informal hearing on the claim and issues findings of fact and conclusions of law.  Id. The decision of the director may be administratively appealed to the LIRAB, which conducts a de novo, trial-like hearing on the appeal from the director's determination.  HRS § 386-87(a)-(c). A LIRAB decision may be appealed directly to the ICA.  HRS § 386-73.5; HRS § 386-88.

## B. A PPD award requires a finding of some determinate impairment of a mental or physical function

The ICA held that a PPD award requires a finding of some percentage of mental or physical impairment. The ICA concluded that the Board's findings as to the extent of Ihara's impairment were ambiguous. Under the Board's findings, it is possible to conclude either that Ihara suffered no permanent impairment or that he suffered some impairment, but not in a ratable amount. The ICA concluded that under either of the two alternative interpretations, the Board erred. As to the first alternative, "[i]f the LIRAB's conclusion was that Ihara suffered no impairment, then its interpretation of HRS § 386-32(a) was erroneous because a PPD award requires a finding that there is some mental or physical impairment." The ICA explained that the definition section of HRS chapter 386 defines disability as "loss or impairment of a physical or mental function," and it concluded that an impairment is necessary to support a PPD award because the definition of disability explicitly includes a loss or impairment. As to the second alternative, that Ihara had suffered some impairment, but not in a ratable amount, the ICA concluded that the Board had impermissibly imported Ihara's reduced ability to work as a criterion in deciding Ihara's PPD

impairment.  In the ICA's view, the legislative intent of the statute "makes clear that PPD is solely based on a claimant's physical or mental impairment and not on his ability to work." We consider the ICA's analysis of the first alternative in this section and its analysis of the second alternative in the next section.

In regard to the first alternative, Ihara argues that the ICA failed to "recognize long-standing precedents which did not require a finding of some mental or physical impairment in order to award PPD."  Ihara argues that the Hawaiʻi workers' compensation statute has an established history of awarding PPD even in the absence of impairment, citing a number of the LIRAB's administrative adjudications.

Ihara is mistaken.  His analysis of the LIRAB decisions confuses the LIRAB's impairment rating with a physician's impairment rating.  The LIRAB decisions Ihara cites do, in fact, serve as instances where a physician gave a 0% impairment rating, or found no impairment, and yet the LIRAB awarded a small percentage of PPD.  However, these decisions merely show that it is not necessary for a physician to find a percentage of impairment under the AMA Guides in order for the LIRAB to award PPD.  The LIRAB decisions he cites do not negate the fact that

20

the LIRAB must ultimately find impairment before making a PPD award. In the decisions Ihara cites, the LIRAB found that the physician's 0% or low impairment rating based on the AMA Guides did not fully reflect the claimant's total loss or impairment, and so it further evaluated the record to reach an accurate impairment rating.[6] We approved this practice in Cabatbat when we quoted the Arizona Supreme Court's holding that where the AMA Guides and the physician's assessment do not give an accurate portrayal of the total loss of impairment, the director or Board should take other factors into account to reach an accurate disability determination. 103 Hawaiʻi at 9, 78 P.3d at 764 ("when the AMA Guides do not truly reflect a claimant's loss, the [administrative law judge] must use his discretion to hear additional evidence and, from the whole record, establish a rating independent of the AMA recommendations." (quoting Slover Masonry, Inc. v. Indus. Comm'n, 761 P.2d 1035, 1040 (Ariz. 1988))). We later reaffirmed this view when we stated that other factors affecting a PPD assessment include "skills, education, job history, adaptability, age, and environment . . . ." Duque

---

[6] See, e.g., Ibarra, AB 2009-504 at 7-8 (awarding claimant 2% PPD despite crediting physician's 0% impairment rating under the AMA Guides because lower back injury affected ability to work); Chi, AB 2006-116 at 3-4 (awarding claimant 3% PPD for residual eye problems despite AMA Guides rating his vision impairment at 0%).

21

v. Hilton Hawaiian Vill., 105 Hawaiʻi 433, 439, 98 P.3d 640, 646 (2004)(quoting the AMA Guides).

Furthermore, none of the LIRAB decisions Ihara marshals demonstrate circumstances where the LIRAB found the claimant suffered no impairment whatever; on the contrary, in each of these cases, the LIRAB found that the complainant's daily activities at home or at work were permanently affected due to the injury. For example, in Chi, a police officer who was struck in the eye rated at 0% impairment according to the vision test outlined in the AMA Guides, but based on testimony that he suffered from double vision and was no longer able to engage in certain activities of daily living as a result, the LIRAB awarded him 3% PPD. AB 2006-116 at 3-4.

It follows that even where a physician finds there is no impairment under the standards in the AMA Guides, or fails to give an impairment rating, the LIRAB has the discretion to consider the entire record, even beyond the physician's impairment rating, to determine the most accurate impairment rating possible. The AMA Guides itself does not require an award of permanent partial disability to be conditioned upon a finding of impairment by a physician. Instead, the AMA Guides emphasizes that it "is not intended to be used for direct estimates of work

22

disability.  Impairment percentages derived according to the *Guides* criteria do not measure work disability.  Therefore, it is inappropriate to use the *Guides*' criteria or ratings to make direct estimates of work disability."  AMA Guides (Fifth Edition, 2000), at 9; id. at 13 ("Impairment percentages estimate the extent of the impairment of the whole person functioning and account for basic activities of daily living, not including work. The complexity of work activities requires individual analysis. Impairment assessment is a necessary *first step* for determining disability.")(emphasis in original)).

The cases Ihara cites represent instances where the physician found no percentage of impairment, but after reviewing the record, the LIRAB found impairment based on additional or other evidence.  None of the cases Ihara highlights include a scenario where the LIRAB found that there was no impairment whatever, yet still awarded PPD.  Thus, the ICA accurately held that a PPD award requires a finding of some physical or mental impairment.

Following Ihara's hearing, the Board did not determine Ihara's PPD using the percentage of impairment, and instead directly awarded him a monetary lump sum of $250 with no explanation as to how it calculated the amount of the award.

The statutory formula uses the impairment percentage to calculate the monetary amount of the PPD award, stating that "[i]n cases in which the permanent partial disability must be rated as a percentage of the total loss or impairment . . . the maximum compensation shall be computed on the basis of the corresponding percentage of the product of three hundred twelve times the effective maximum weekly benefit rate . . . ." HRS § 386-32(a).[7] Given this statutory provision, the LIRAB cannot calculate Ihara's monetary PPD award in accordance with the statute without first establishing his percentage of impairment.

Accordingly, the ICA correctly vacated Ihara's PPD award. A PPD award for an unscheduled injury that is not comparable to a scheduled injury must be based on a finding of some determinate percentage of "the total loss or impairment of a physical or mental function of the whole person." HRS § 386-32(a). The percentage may correspond to the percentage of impairment found by a physician using the AMA Guides. The percentage may also correspond to a physician's rating of

---

[7] Ihara also contends that HRS § 386-32(a) only requires that a PPD percentage be used to calculate the maximum PPD for which a claimant is eligible, and that no percentage is required to calculate the PPD a claimant is actually awarded. Even were Ihara's interpretation of the statutory language correct, the statute mandates that the LIRAB still must find a PPD percentage to set the ceiling of a claimant's PPD award eligibility. Because the LIRAB failed to establish a percentage, it was unable to calculate the maximum PPD award for which Ihara was eligible.

24

impairment based on "any other such guides which the director deems appropriate and proper," and therefore "may be used as a reference or guide in measuring a disability." HAR § 12-10-21(a). Where a physician's estimate of the permanent impairment under the AMA Guides is zero, the Board nonetheless has the discretion to find a determinate degree of impairment using standards not encompassed by the AMA Guides.

**C. A claimant's loss of wage-earning capacity cannot be considered in determining permanent partial disability; however, reduced ability to perform one's usual and customary work post-injury can be considered in determining PPD**

The ICA concluded: "The legislative intent of HRS § 386-32(a) makes clear that PPD is solely based on a claimant's physical or mental impairment and not on his ability to work." As the ICA stated, the legislative history of the statute "strengthens the conclusion that awards for PPD are meant to be based on the extent of a claimant's impairment and not on his wage-earning capacity or ability to work." Accordingly, the ICA held that inability (or reduced ability) to perform work-related activities may never be a factor in determining PPD awards.

This analysis fails to distinguish with sufficient precision between a post-injury reduced ability to perform the work activities of one's former position (which may be relevant

25

to PPD), on the one hand, and loss of future wage-earning capacity (which is relevant only to total disability determinations), on the other.  While total disability awards compensate a worker who has lost his or her wage-earning capacity, permanent partial disability awards serve a different purpose: to compensate the worker for a loss of bodily integrity. Cuarisma v. Urban Painters, Ltd., 59 Haw. 409, 421, 583 P.2d 321, 327 (1978).

Stated differently, loss of wages or earning capacity is relevant to **total** disability (whether temporary total disability or permanent total disability), but it is not a relevant criterion in determining permanent **partial** disability. Id. ("Permanent partial disability compensation is an indemnity payment for the loss or impairment of a physical function and, unlike temporary total disability benefits, is not compensation to replace current loss of wages.").[8]  See also H. Stand. Comm. Rep. No. 418-470, in 1970 House Journal, at 76 (indicating that while loss of wage-earning capacity affects total disability

---

[8]    Cuarisma's holding was limited to disfigurement benefits, which are a separate category of PPD under the statute. Cuarisma, 59 Haw. at 413, 583 P.2d at 323-24.

26

awards, it should not be considered in PPD awards)[9].  In short, the ICA correctly held that PPD awards may not be based on wage loss or earnings loss, because PPD awards rest on a different rationale than awards for total disability, whether permanent or temporary total disability.

However, the ICA mistakenly concluded that eligibility for a PPD award may never be based, even in part, on an inability or reduced ability, post-injury, to perform one's usual and customary work.  In so concluding, the ICA incorrectly supposed that considering the claimant's post-injury inability to perform his or her usual and customary work is the equivalent of considering the loss-of-wages rationale appropriate only to total disability awards.

A total disability award provides the injured worker with a replacement income stream because he or she can no longer work and therefore cannot earn a living.  For that reason, loss of income is a necessary component of a total disability award.

---

[9]     The relevant text reads:

> [T]otal disability is defined as disability of such an extent that the disabled employee has no reasonable prospect of finding regular employment of any kind in the normal labor market .  .  .  Permanent partial disability compensation payments under the law, however, are based primarily on impairment of physical or mental function and not on ability for work.

Determination of a PPD award, in contrast, compensates the worker not for total loss of income but for partial loss of function, either physical function or mental function. Phrased another way, a total disability award is ultimately income-based; a partial disability award is ultimately function-based.

A reduced ability to perform one's pre-injury work activities may indicate a permanent partial loss of function, that is, an impairment, and a permanent partial loss of function is precisely the kind of loss for which PPD awards compensate the injured worker. The fact that the loss of function may be manifested in a reduced ability to perform one's pre-injury work activities does not make a PPD award income-based rather than function-based.

Our conclusion is buttressed by the Board's expertise and experience in this complex field. The LIRAB's administrative adjudications consistently follow the distinction between wage-based total disability awards and function-based partial disability awards. In Belanio, the LIRAB awarded permanent partial disability based on claimant Belanio's inability to perform his usual and customary work. Belanio suffered injuries to his lower back that prevented him from returning to his usual and customary job as an equipment operator. LIRAB Case No. AB

2007-532, at 6.  The LIRAB stated that "[b]ased on Claimant's testimony and medical evidence restricting Claimant from returning to his usual and customary job, the Board finds that Claimant sustained some loss or impairment of physical function." Id.  In Ibarra, the LIRAB again awarded PPD where an employee hurt his shoulder at work although -- according to the AMA Guides -- he was rated at 0% impairment of his whole person.  LIRAB Case No. AB 2009-504, at 6.  The LIRAB awarded a 2% PPD award based on its conclusion that "Claimant's ability to work, even while [the doctor] released Claimant to 'full capacity' work, was affected by Claimant's injury" where the claimant changed jobs following his injury due to his inability to undertake heavy-lifting activities.  Id. at 7.

The LIRAB's decisions stand for the proposition that a claimant's inability to perform his or her usual and customary work activities legitimately may be considered in determining PPD awards, especially where the AMA Guides do not present an accurate rating of the full extent of the claimant's impairment or loss of a physical or mental function.  Additionally, as discussed supra, Cabatbat and Duque support the LIRAB's consideration of work activities, in that each holds that other factors outside of a physician's impairment evaluation may

29

permissibly affect the determination of a claimant's PPD award. Cabatbat, 103 Hawaiʻi at 9, 78 P.3d at 764; Duque, 105 Hawaiʻi at 439, 98 P.3d at 646.

In Ihara's case, the LIRAB appropriately considered his inability to return to his regular course of work when determining his PPD award:

> The Board credits the opinions that Claimant sustained no ratable impairment. However, Employer's July 11, 2008 letter admitted or acknowledged permanent disability, stated that Claimant was "medically disqualified" for his position, and terminated him therefrom. Therefore, the Board finds that Claimant sustained permanent partial disability in the amount of $250.

However, the LIRAB awarded Ihara a lump sum of $250 without explaining its basis for doing so, when it should have first determined his percentage of impairment and then calculated the correct dollar amount of the PPD award according to the formula in the statute. HRS § 386-32(a). Thus, although the ICA incorrectly interpreted the law in holding that work activities cannot play a role in determining PPD awards, it properly vacated and remanded the LIRAB's decision awarding Ihara $250 in PPD.

We defer to the LIRAB's expertise in determining that Ihara suffered from a permanent partial disability, and do not substitute our judgment for its judgment concerning that determination. In re Water Use Permit Applications, 94 Hawaiʻi

97, 119, 9 P.3d 409, 431 (2000)("When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field. The court should not substitute its own judgment for that of the agency." (citation, braces, and internal quotation marks omitted)). On the other hand, we find the factual basis for the Board's awarding Ihara a lump sum of $250 for his PPD insufficient to allow us to discern the steps by which the LIRAB reached that decision. Kauai Springs, 133 Hawaiʻi at 164, 324 P.3d at 974 (noting that an "agency's findings should be 'sufficient to allow the reviewing court to track the steps by which the agency reached its decision.'" (citation omitted)); Int'l Bhd. of Elec. Workers, 68 Haw. at, 328, 713 P.2d at 953 ("A remand pursuant to HRS § 91-14(g) is appropriate if an agency's findings are incomplete").

We therefore remand this matter to the LIRAB to determine the relevant percentage of Ihara's impairment, as well as to determine an award of PPD benefits based on that percentage.

## V. CONCLUSION

For the foregoing reasons, we affirm in part the ICA's vacating of the LIRAB's March 13, 2012 decision awarding $250 in

31

PPD to Ihara.  While we affirm in part, we also correct the ICA's rationale for vacating and remanding.  We leave intact the LIRAB's determination that Ihara suffered some permanent partial disability.  We vacate only the Board's $250 lump sum award to Ihara, and we remand to the LIRAB for it to determine the relevant percentage of Ihara's impairment, as well as an award of PPD benefits based on that percentage.

Wayne H. Mukaida
for petitioner

Scott G. Leong and
Shawn L.M. Benton
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

