**FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER**

**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-17-0000600**
**22-DEC-2022**
**07:56 AM**
**Dkt. 95 OP**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

JEROME C. PAVE, Claimant,
v.
PRODUCTION PROCESSING, INC., Employer-Appellee/Appellee,
and
GALLAGHER BASSETT SERVICES, INC., Insurance Carrier-
Appellee/Appellee,
and
SPECIAL COMPENSATION FUND, Appellant/Appellant

NO. CAAP-17-0000600

APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS APPEALS BOARD
(CASE NO. AB 2015-011 (DCD No. 2-10-02936))

————

CLYDE A. DIAS, Claimant,
v.
ALTRES, INC., Employer-Appellant/Appellee,
and
HAWAII EMPLOYERS' MUTUAL INSURANCE COMPANY, Inc., Insurance
Carrier-Appellant/Appellee,
and
SPECIAL COMPENSATION FUND, Appellee/Appellant

NO. CAAP-17-0000925

APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS APPEALS BOARD
(CASE NO. AB 2014-387 (DCD No. 2-08-08354))

DECEMBER 22, 2022

LEONARD, PRESIDING JUDGE, HIRAOKA AND NAKASONE, JJ.

<u>OPINION OF THE COURT BY HIRAOKA, J.</u>

In each of these consolidated appeals, a person was accidentally injured while working. Before being injured, the person had an asymptomatic physical condition that contributed to cause post-work-accident disability, but there was no evidence that the preexisting condition had impaired the person's physical functioning before the work accident. Each person was awarded permanent partial disability (**PPD**) benefits under the Hawai'i Workers' Compensation Law, Hawaii Revised Statutes (**HRS**) Chapter 386. The Labor and Industrial Relations Appeals Board (**LIRAB** or the **Board**) apportioned liability for PPD benefits to the Special Compensation Fund (**SCF**). The issue in each appeal is whether SCF is liable to pay a portion of the PPD award.[1]

We hold that SCF is not liable for PPD benefits if an employee's preexisting "condition" did not cause a "disability" — that is, "loss or impairment of a physical or mental function" — before the employee's work accident. The record in each case contains no evidence that the injured employee was physically impaired before their work accident. In each case, at least one doctor apportioned causation of post-work-accident disability to a preexisting condition; but in neither case was there evidence that the preexisting condition had caused a pre-work-accident loss or impairment of physical or mental function. Accordingly, in each appeal we reverse the decision and order issued by LIRAB.

**BACKGROUND**

The Hawai'i Workers' Compensation Law was enacted as a humanitarian measure, to create legal liability for work injuries without relation to fault. <u>See</u> <u>Evanson v. Univ. of Haw.</u>, 52 Haw. 595, 598, 483 P.2d 187, 190 (1971). Such laws "represent a socially enforced bargain: the employee giving up [their] right

---

[1]      The injured persons are not parties to these appeals and our decision does not affect their rights to receive PPD benefits, or the amounts of benefits to which they are entitled. Only the source of the benefits is at issue.

to recover common law damages from the employer in exchange for the certainty of a statutory award for all work-connected injuries."[2] Id.

SCF is a trust fund administered by the State of Hawai‘i. HRS § 386-151(a) (2015). It is funded by annual levies upon workers compensation insurers, HRS § 386-153 (2015), and uninsured employers and self-insurance groups, HRS § 386-154 (2015). If an employer fails to pay workers compensation benefits to an injured employee, SCF pays the benefits and becomes subrogated to the injured employee's rights against the employer. HRS § 386-56 (2015).

One benefit to which an injured worker may be entitled is compensation for permanent partial disability, or PPD, under HRS § 386-32(a) (Supp. 2007).[3] "The purpose of a PPD award . . . is to compensate a worker for the loss or impairment of a physical or mental function." Ihara v. State Dep't of Land & Nat. Res., 141 Hawai‘i 36, 42, 404 P.3d 302, 308 (2017). "A PPD award is payable to the worker even if the worker returns to work, and the amount of the award derives from the extent of a worker's impairment rather than [their] wage-earning capacity." Id. (citing HRS § 386-32(a)).

SCF can become obligated to pay PPD benefits. HRS § 386-33 (Supp. 2007) provides, in relevant part:

> **Subsequent injuries that would increase disability.**
> (a) Where prior to any injury an employee suffers from a
> ***previous*** permanent partial ***disability*** already existing prior
> to the injury for which compensation is claimed, and the

---

[2]     Accordingly, apportionment-of-damages tort cases, see, e.g., Montalvo v. Lapez, 77 Hawai‘i 282, 884 P.2d 345 (1994), do not apply to workers compensation cases.

[3]     Permanent partial disabilities fall into two classes: scheduled and unscheduled. Scheduled disabilities are those listed in HRS § 386-32(a); unscheduled disabilities are those not listed. The statutory schedule lists benefits to be paid for partial or complete loss of specific body parts or functions. For loss or impairment of a body part or function that is not scheduled, or not comparable to a scheduled loss or impairment, the PPD is rated as a percentage of the total loss or impairment of a physical or mental function of the whole person. Ihara v. State Dep't of Land & Nat. Res., 141 Hawai‘i 36, 42-43, 43 n.5, 404 P.3d 302, 308-09, 309 n.5 (2017).

disability resulting from the injury **combines** with the **previous disability**, whether the previous permanent partial disability was incurred during past or present periods of employment, to result in a **greater permanent partial disability** . . . then weekly benefits shall be paid as follows:

(1)     In cases where the disability resulting from the injury **combines** with the **previous disability** to result in greater permanent partial disability the employer shall pay the employee compensation for the employee's actual permanent partial disability but for not more than **one hundred four weeks**; the balance if any of compensation payable to the employee for the employee's actual permanent partial disability shall thereafter be paid out of the special compensation fund; provided that in successive injury cases where the claimant's entire permanent partial disability is due to more than one compensable injury, the amount of the award for the subsequent injury shall be offset by the amount awarded for the prior compensable injury[.]

. . . .

(b)     Notwithstanding subsection (a), where the director or the appellate board determines that the **previous** permanent partial **disability** amounted to **less than that necessary to support an award of thirty-two weeks of compensation for permanent partial disability**, there shall be no liability on the special compensation fund and the employer shall pay the employee . . . full compensation for the employee's permanent partial . . . disability[.]

(Emphasis added.)  "Disability" is defined as "loss or impairment of a physical or mental function."  HRS § 386-1 (1993).

HRS § 386-33 potentially reduces an employer's liability to pay PPD benefits for a work injury if the injured employee had a loss or impairment of a physical or mental function before the work injury at issue, and the preexisting disability combined with the work injury to cause a greater disability.  In such cases, HRS § 386-33 envisions three scenarios:

**(1)**     if the preexisting loss or impairment of a physical or mental function was the subject of an award of PPD benefits, the amount of those benefits is deducted from the PPD award for the work injury at issue;

4

      **(2)**   if the preexisting loss or impairment of a physical or mental function was not the subject of an award of PPD benefits, but would have supported an award of at least thirty-two weeks of compensation for PPD, the employer's PPD liability is capped at one hundred four weeks, and SCF is liable to pay any remaining PPD benefits; or

      **(3)**   if the preexisting loss or impairment of a physical or mental function was not the subject of an award of PPD benefits, and would not have supported an award of thirty-two weeks of compensation for PPD, the employer is liable for the full amount of PPD benefits.

Under any of these scenarios, HRS § 386-33 is triggered if, when the work accident happened, the injured employee already had a loss or impairment of a physical or mental function that, combined with additional loss or impairment of the same physical or mental function caused by the work accident, resulted in a greater post-work-accident loss or impairment of the physical or mental function. See Bumanglag v. Oahu Sugar Co., 78 Hawaiʻi 275, 280, 892 P.2d 468, 473 (1995).

### The Pave Case

On March 19, 2010, Claimant Jerome **Pave** injured his neck while working for Employer-Appellee/Appellee Production Processing, Inc. The employer reported the accident to the Hawaiʻi Department of Labor and Industrial Relations (**DLIR**) and claimed apportionment with SCF.

DLIR's disability compensation division (**DCD**) found that Pave "suffered 34% PPD of the whole person for the neck" and held his employer liable for the first 104 weeks of the PPD award, with the remainder to be paid by SCF.

SCF appealed to LIRAB. The sole issue on appeal was whether any PPD liability should be apportioned to SCF. LIRAB issued a decision and order on July 27, 2017, affirming the DCD

decision.  SCF appealed, resulting in CAAP-17-0000600 (the **Pave Appeal**).

### The Dias Case

On June 4, 2008, Claimant Clyde **Dias** accidentally injured his right knee while working for Employer-Appellant/Appellee Altres, Inc.  The employer reported the accident to DLIR and claimed apportionment with SCF.

DCD found that Dias "sustained 45% PPD of the right leg" and held his employer liable for the first 104 weeks of the PPD award, with the remainder to be paid by SCF.  SCF requested reconsideration.  Reconsideration was granted.  DCD issued an amended decision holding the employer solely liable for PPD benefits and denying the employer's claim for contribution from SCF.

The employer appealed to LIRAB.  The sole issue on appeal was whether any PPD liability should be apportioned to SCF.  LIRAB issued a decision and order on November 30, 2017, reversing the amended DCD decision.  LIRAB concluded that liability for Dias's PPD benefits should be apportioned between the employer and SCF.  SCF filed a timely notice of appeal, resulting in CAAP-17-0000925 (the **Dias Appeal**).

### POINTS OF ERROR

In the Pave Appeal, SCF challenges LIRAB's findings of fact (**FOF**) nos. 17, 27, 39, 40, 41, 42, 43, and 44; and four of LIRAB's conclusions of law, which were not numbered by LIRAB.

In the Dias Appeal, SCF challenges LIRAB's FOF nos. 4, 5, 6, 7, 9, 10, 11, 12, and 14; and LIRAB's conclusion of law (**COL**) no. 1.

**STANDARDS OF REVIEW**

### LIRAB Decisions

"Appellate review of a LIRAB decision is governed by the provisions of the Hawaiʻi Administrative Procedure Act relating to judicial review of agency action." Ihara, 141 Hawaiʻi at 41, 404 P.3d at 307 (citations omitted). The Act provides, in relevant part:

> Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority or jurisdiction of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error of law;
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91-14(g) (Supp. 2021).

### Findings of Fact and Conclusions of Law

LIRAB's label of a finding of fact or a conclusion of law does not determine the standard of review. City & Cnty. of Honolulu v. Honolulu Police Comm'n, 151 Hawaiʻi 56, 62, 508 P.3d 851, 857 (App. 2022) (citing Crosby v. State Dep't of Budget & Fin., 76 Hawaiʻi 332, 340, 876 P.2d 1300, 1308 (1994)). "The question whether an agency's determination is a finding of fact or a conclusion of law is a question of law. Thus, the accuracy of the label affixed by the agency is freely reviewable by reviewing courts." Kilauea Neighborhood Ass'n v. Land Use

Comm'n, 7 Haw. App. 227, 229, 751 P.2d 1031, 1034 (1988) (citation omitted).

Findings of fact are reviewed under the clearly erroneous standard. HRS § 91-14(g)(5); Del Monte Fresh Produce (Haw.), Inc. v. International Longshore & Warehouse Union, Local 142, 128 Hawai‘i 289, 302, 287 P.3d 190, 203 (2012). A finding of fact is clearly erroneous when the record lacks substantial evidence to support the finding or when, despite substantial evidence to support the finding, we are left with a definite and firm conviction that a mistake has been committed. Est. of Klink ex rel. Klink v. State, 113 Hawai‘i 332, 351, 152 P.3d 504, 523 (2007). "Substantial evidence" is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (citations omitted). When reviewing findings of fact, however, we "cannot consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the finding of an expert agency in dealing with a specialized field." Sierra Club v. D.R. Horton-Schuler Homes, LLC, 136 Hawai‘i 505, 522, 364 P.3d 213, 230 (2015) (cleaned up).

Conclusions of law are reviewed de novo under the right/wrong standard. HRS § 91-14(g)(1), (2), (4); Ihara, 141 Hawai‘i at 41, 404 P.3d at 307 (citation omitted). When a conclusion of law presents mixed questions of fact and law, we review it under the clearly erroneous standard because LIRAB's conclusions are dependent on the facts and circumstances of each individual case, Klink, 113 Hawai‘i at 351, 152 P.3d at 523, while giving deference to the agency's expertise and experience in the particular field and not substituting our own judgment for that of the agency, Ihara, 141 Hawai‘i at 41, 404 P.3d at 307.

8

**Statutory Interpretation**

Interpretation of a statute is a question of law reviewed de novo under the right/wrong standard. Cabatbat v. Cnty. of Haw., Dep't of Water Supply, 103 Hawaiʻi 1, 6, 78 P.3d 756, 761 (2003), as corrected (Dec. 8, 2003). "[T]he fundamental starting point of statutory interpretation is the language of the statute itself. Where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." Priceline.com, Inc. v. Dir. of Tax'n, 144 Hawaiʻi 72, 87, 436 P.3d 1155, 1170 (2019) (cleaned up).

"The general principles of construction which apply to statutes also apply to administrative rules. As in statutory construction, courts look first at an administrative rule's language. Thus, . . . the interpretation of a[n administrative] rule presents a question of law . . . [reviewed] under the right/wrong standard." Cabatbat, 103 Hawaiʻi at 6, 78 P.3d at 761 (cleaned up).

## DISCUSSION

An employer seeking to obtain contribution from SCF for PPD benefits under HRS § 386-33 must prove that: (1) the injured employee suffered from a preexisting permanent partial disability; (2) the preexisting permanent partial disability would support an award of thirty-two weeks of PPD benefits; and (3) the preexisting permanent partial disability and the subsequent work-related injury combined to cause a greater present permanent partial disability. Bumanglag, 78 Hawaiʻi at 280, 892 P.2d at 473. "Disability" is defined as "loss or impairment of a physical or mental function." HRS § 386-1.

Hawaii Administrative Rules (**HAR**) § 12-10-28 requires that "[t]he extent of medical impairment preexisting the work injury[] shall be assessed by a physician pursuant to section 12-10-21(a)." HAR § 12-10-21(a) states: "Impairment rating guides issued by the American Medical Association, American

Academy of Orthopedic Surgeons, and any other such guides which the director [of the Department of Labor and Industrial Relations] deems appropriate and proper may be used as a reference or guide in measuring a disability."  Thus, "initial PPD ratings for unscheduled injuries are typically provided by medical experts using rating categories outlined in the various editions of the American Medical Association's <u>Guides to the Evaluation of Permanent Impairment</u> (AMA Guides), and then the LIRAB may add additional percentage points depending on the magnitude of the impairment rating."  <u>Ihara</u>, 141 Hawai'i at 43, 404 P.3d at 309 (citing HAR § 12-10-21(a)).  LIRAB decides the final PPD rating.  <u>Id.</u> (citing <u>Cabatbat</u>, 103 Hawai'i at 9, 78 P.3d at 764).

### The Pave Appeal

Pave's neck injury was evaluated by doctors Peter **Lum**,[4] Christopher **Brigham**,[5] Lorne **Direnfeld**, and Clifford **Lau**,[6] among others.  The following findings of fact by LIRAB are unchallenged and binding on appeal.  <u>See</u> <u>Okada Trucking Co. v. Bd. of Water Supply</u>, 97 Hawai'i 450, 459, 40 P.3d 73, 82 (2002).

> 1.    [Pave] was injured on March 19, 2010, while working at Makaha on Oahu as a water safety person for Employer, a media services company engaged in film production.
>
> 2.    At the time of the March 19, 2010 injury, [Pave] was in the ocean, in six to eight feet of surf, moving a 60-pound camera mounted on a surfboard for Employer, when he dove beneath the surfboard to avoid an incoming wave.  The surfboard struck his head.
>
> 3.    On March 19, 2010, [Pave] was hospitalized after he was pulled to shore by a co-worker because he was unable to move his extremities.  He regained movement while being transported to the emergency room.  After emergency

---

[4]    Dr. Lum was Pave's treating physiatrist.

[5]    Dr. Brigham reviewed Pave's pre- and post-work-accident medical records and examined Pave on behalf of SCF.

[6]    Drs. Direnfeld and Lau reviewed Pave's post-work-accident medical records and examined Pave on behalf of Pave's employer.

treatment at the Waianae Coast Comprehensive Health Center, [Pave] was transferred to Kaiser Permanente at Moanalua (Kaiser).

4.     On March 19, 2010, Kaiser Emergency Department physician Ben Kulia, M.D.'s impression of [Pave]'s injury was of a cervical cord contusion.  Neurologic examination revealed some hypesthesia[7] to both upper arms on the triceps and biceps.

5.     A[n] MRI of [Pave]'s cervical spine done on March 20, 2010, revealed a congenitally narrow spinal canal, superimposed cervical disc protrusions at C3-4 and C4-5 causing mild spinal stenosis,[8] and a large central disc protrusion at C5-6 causing severe spinal stenosis and compressing the spinal cord. . . .

6.     On March 20, 2010, Jaelene Yates, M.D. noted in a Kaiser discharge summary that on March 19, 2010, [Pave] had a "[c]ervical spine contusion[9] in the setting of a preexisting spinal stenosis." . . .  Dr. Yates also noted that [Pave] *had not seen a physician in several years and had been in good health prior to the March 19, 2010 work injury*.

. . . .

9.     On September 14, 2010 . . . , neurologist Lorne Direnfeld, M.D. examined [Pave] at Employer's request, reviewed [Pave]'s medical records, and gave the following diagnoses in his September 17, 2010 report: cervical myelopathy[10] (problems with spinal cord function at neck level), cervical spondylosis[11] (age-related, genetically influenced degenerative disc and joint changes in the cervical spine) . . . .

10.     Dr. Direnfeld reported that, on examination, [Pave] complained of burning pain in his arms and numbness in his upper body with neck movement.  [Pave] experienced an

---

[7]     "Hypesthesia" means "impaired or decreased tactile sensibility[.]" Hypesthesia, Merriam-Webster, https://www.merriam-webster.com/medical/hypesthesia (last visited Dec. 14, 2022).

[8]     "Stenosis" means "a narrowing or constriction of the diameter of a bodily passage or orifice[.]"  Stenosis, Merriam-Webster, https://www.merriam-webster.com/dictionary/stenosis (last updated Dec. 11, 2022).

[9]     "Contusion" means "injury to tissue usually without laceration[.]" Contusion, Merriam-Webster, https://www.merriam-webster.com/dictionary/contusion (last updated Dec. 9, 2022).

[10]     "Myelopathy" means "a disease or disorder of the spinal cord or bone marrow."  Myelopathy, Merriam-Webster, https://www.merriam-webster.com/dictionary/myelopathy (last visited Dec. 14, 2022).

[11]     "Spondylosis" means "any of various degenerative diseases of the spine."  Spondylosis, Merrian-Webster, https://www.merriam-webster.com/medical/spondylosis (last visited Dec. 14, 2022).

occasional needle sensation in both hands and stiffness in the morning. [Pave] also reported bowel and bladder control problems and difficulty with sexual function.

11. Dr. Direnfeld noted that *prior to the March 19, 2010 work injury, [Pave] did not have symptoms of cervical myelopathy*. Dr. Direnfeld opined that [Pave]'s primary diagnosis of cervical myelopathy was the result of a combination of factors, including the March 19, 2010 work injury and the pre-existing cervical spondylosis.

12. Dr. Direnfeld assessed [Pave] as having 22% whole person ("WP") permanent impairment, pursuant to the American Medical Association's Guides to the Evaluation of Permanent Impairment, Fifth Edition ("AMA Guides"), using Table 15-6, Rating Corticospinal Tract Impairment, to measure neurological impairment of the neck (15% WP impairment) and using Table 15-5, Criteria for Rating Impairment Due to Cervical Disorders (DRE estimates), to obtain a DRE rating of the neck (8% WP impairment).

13. Dr. Direnfeld then combined the two impairment ratings, and apportioned one-half or 50% (11% WP permanent impairment) to [Pave]'s preexisting *condition* of cervical spondylosis and 50% (11% WP permanent impairment) to the effects of the March 19, 2010 work injury.

. . . .

18. On January 28, 2011, [Pave's treating physiatrist] Dr. Lum noted in his progress notes that [Pave] *"denies having similar complaints or injury to the same body parts in the past."*

. . . .

21. On March 13, 2013, at Employer's request, [Pave] was examined by orthopedic surgeon Clifford Lau, M.D. . . .

22. After examining [Pave] and reviewing the medical records, Dr. Lau's impression was:

> 1. Status post anterior cervical discectomy and fusion using hardware for cervical disk protrusion with cervical cord myelopathy with underlying preexisting cervical spondylosis.

. . . .

24. Dr. Lau rated [Pave] at 25% WP permanent impairment of the cervical spine according to the AMA Guides DRE cervical category IV (for a cervical fusion causing loss of movement and joint space), and 7% impairment of the upper extremity for the cervical cord. Combining these ratings, using the combination table of the AMA Guides, Dr. Lau rated [Pave]'s neck/cervical spine at 30% WP impairment.

. . . .

26. Dr. Lau opined that he agreed with Dr. Direnfeld's apportionment of [Pave]'s WP impairment with

the underlying degenerative **condition** of the cervical spine due to the congenital narrowing of the cervical spine plus [Pave]'s metabolic problems and diabetes. Dr. Lau would assign 50% of [Pave]'s WP impairment (equal to 15% WP) to preexisting causes (cervical spondylosis, cervical stenosis and [Pave]'s untreated medical problems) and 50% (or 15% WP) to the March 19, 2010 work injury.

. . . .

29. At his oral deposition on April 1, 2015, [Pave] testified that other than a tennis elbow condition during his early twenties, tendinitis of the left wrist while working for a previous employer, and a knee and low back injury twenty years earlier, for which he received chiropractic treatment, he only went to the doctor for things like flu shots prior to the March 19, 2010 work injury. **Before the work injury, [Pave] actively engaged in mountain biking, surfing, diving, playing a guitar and driving. He could perform all activities of daily living**.

30. [Pave] also testified that before the March 19, 2010 work injury, **he never had an injury to his head, neck, and thoracic region or any restricted motion in his neck or arms**. He had **never sought treatment for his neck**, or had a neck x-ray, range of motion study or imaging study **prior to the 2010 work injury**.

31. Occupational medicine specialist Christopher Brigham, M.D. performed a records review. In an August 21, 2015 report, Dr. Brigham opined that [Pave] sustained an acute spinal cord contusion with probable central cord syndrome, a traumatic injury to the cervical spine from a forceful hyperextension neck injury with prior degenerative spinal column disease, resulting in more extensive motor weakness in the upper extremities than in the lower extremities.

32. Dr. Brigham noted that [Pave] "had pre-existing cervical degenerative disease with spinal stenosis at C5-C6; however this diagnosis had not been made prior to the March 19, 2010 injury, and **[prior to the work injury] he had not** [sic] **subjective complaints or objective findings of any functional difficulties or impairment**." Dr. Brigham stated that degenerative findings alone (from imaging studies) would not be a basis for rating impairment because degenerative changes are commonly seen in asymptomatic individuals.

33. Dr. Brigham opined that Dr. Direnfeld's and Dr. Lau's 50/50 apportionment assessments of [Pave]'s permanent impairment for the cervical condition were not consistent with how permanent impairment was to be attributed to a work injury and to pre-existing status, pursuant to the AMA Guides. Dr. Brigham commented that Dr. Direnfeld had opined that both pre-existing **factors** and the work injury contributed to [Pave]'s impairment and then simply allocated equal weight to each. However, **Dr. Direnfeld did not analyze what [Pave]'s permanent impairment would have been on the day prior to the work injury**.

13

(Emphasis added.)[12]

SCF challenges a number of LIRAB's findings of fact. LIRAB found (the portions specifically challenged by SCF are underscored):

> 17.   On December 28, 2010, [Pave]'s treating physician Dr. Lum reported that he agreed with Dr. Direnfeld's assessment of 22% WP permanent impairment for [Pave]'s work injury, but he disagreed with Dr. Direnfeld's apportionment rating "because [Pave's] impairment prior to the injury was 0% whole man." Dr. Lum provided no explanation for his opinion that [Pave] had no preexisting WP impairment.

LIRAB's own findings contradict FOF no. 17.  FOF no. 18 states, in relevant part: "Dr. Lum noted in his progress notes that [Pave] 'denies having similar complaints or injury to the same body parts in the past.'"  LIRAB's finding that "Dr. Lum provided no explanation for his opinion that [Pave] had no preexisting WP impairment" was clearly erroneous; Dr. Lum's explanation was that Pave did not complain about his neck before his work accident.

LIRAB found:

> 27.   On May 15, 2013, Dr. Lum reported that he agreed with the impairment rating by Dr. Lau but not with the apportionment because [Pave] "had no previous history of [sic] spinal cord injury" and "no known preexisting impairment prior to the injury therefore the rating should not be apportioned." Dr. Lum did not mention [Pave]'s pre-existing asymptomatic neck/cervical spine condition.

Dr. Lum was Pave's treating physiatrist; his progress notes mention that Pave was diagnosed with "stenosis of cervical spine [with] myelopathy" after his work injury, and that Pave denied "having similar complaint or injury to the same body parts in the past."  The finding that Dr. Lum did not mention Pave's preexisting condition was not clearly erroneous, but is irrelevant to the issue presented by this appeal.  As we explain below, for purposes of HRS § 386-33 there is a distinction

_____

[12]   In FOF no. 32, the insertion of "[sic]" and the brackets around "prior to the work injury" were by LIRAB.

between an asymptomatic preexisting condition and a preexisting disability — that is, "loss or impairment of a physical or mental function." Therefore, what is relevant is Dr. Lum's report that Pave had no neck impairment before his work accident. Dr. Lum's opinion on apportionment was not based upon Pave having no preexisting condition; it was based upon Pave having no history of neck impairment before his work accident.

LIRAB found:

> 39. The Board finds that a determination of the extent of preexisting PPD is a legal question to be determined by the Director [of Labor and Industrial Relations] or the Board, upon consideration of all the evidence, including the medical records and testimony in the record.

FOF no. 39 is actually a conclusion of law; it is not wrong. Under the DLIR workers compensation administrative rules, "[t]he extent of medical impairment preexisting the work injury[] shall be assessed by a physician[,]" HAR § 12-10-28, using the American Medical Association's Guides to the Evaluation of Permanent Impairment (**AMA Guides**) "and any other such guides which the director [of labor and industrial relations] deems appropriate and proper[,]" HAR § 12-10-21(a). But "[i]t is . . . ultimately the director of the Department of Labor and Industrial Relations [through the DCD] or the Board, and not the physician, that decides the final PPD rating." Ihara, 141 Hawai'i at 43, 404 P.3d at 309 (citing Cabatbat, 103 Hawai'i at 9, 78 P.3d at 764). However, LIRAB's finding that a claimant had a preexisting disability must be based upon some evidence in the record showing that the claimant had an actual loss or impairment of a physical or mental function before the work accident.

LIRAB found:

> 40. In this case, based upon the opinions of Drs. Direnfeld, Lau and Brigham that [Pave] had significant pre-existing cervical **conditions** that contributed to his post[-]injury impairment, the Board finds that apportionment, based on the application of the clinical/pathological judgment of the rating physician, in

the absence of an impairment rating prior to the work injury, is appropriate.

41. The Board finds that in this case, with evidence of significant pre-existing **conditions** in the medical records, the clinical judgment method of assessing apportionment employed by Drs. Direnfeld and Lau is reasonable for determining the extent of medical **impairment** pre-existing the work injury.

42. The Board credits Dr. Direnfeld's and Dr. Lau's apportionment methodology allocating equal weight to pre-existing factors and to the work injury where **measurements of [Pave]'s neck impairment were not available prior to the March 19, 2010 industrial accident.**

43. Applying Dr. Lau's apportionment of 50% of permanent impairment of [Pave]'s neck/cervical spine results in 119.5351 weeks of compensation (15% x 312 weeks at the maximum compensation rate for 2010 = 119.5351 weeks) for 15% pre-existing PPD.

44. Based upon Dr. Direnfeld's and Dr. Lau's clinical judgment of apportionment, the Board finds that Employer has produced sufficient evidence to establish the statutory 32-week compensation threshold of previous PPD necessary for SCF liability.

(Emphasis added) (footnotes omitted). These combined findings of fact and conclusions of law are clearly erroneous.

There is no dispute that Pave had spinal stenosis and cervical spondylosis before his work accident. But there is also no dispute that Pave had not seen a physician in several years and was in good health with no impairment of his neck function before his work accident. Dr. Direnfeld noted that before the March 19, 2010 work accident, Pave did not have symptoms of cervical myelopathy. Pave testified that other than a tennis elbow condition during his early twenties, left wrist tendinitis while working for a previous employer, and a knee and low-back injury twenty years earlier, for which he received chiropractic treatment, he only went to the doctor for things like flu shots before his work injury. He could perform all activities of daily living and actively mountain biked, surfed, dived, played guitar, and drove. He had never injured his head, neck, or thoracic region or had any restricted motion in his neck or arms before his work accident. He had never sought treatment for his neck, or had a neck x-ray, range of motion study, or imaging study

before his work injury.  LIRAB recognized that "measurements of [Pave]'s neck impairment were not available prior to the March 19, 2010 industrial accident" and that "no evaluation for rating permanent impairment was conducted before [Pave]'s March 19, 2010 work injury."

After his work accident, Pave "complained of burning pain in his arms and numbness in his upper body with neck movement[,] . . . occasional needle sensation in both hands and stiffness in the morning[, and] . . . bowel and bladder control problems and difficulty with sexual function."  Pave's treating physiatrist noted that Pave "denies having similar complaints or injury to the same body parts in the past."  The record contains no evidence that Pave experienced any "disability" — defined as "loss or impairment of a physical or mental function" by HRS § 386-1 — because both of his preexisting conditions were asymptomatic before the work accident.

LIRAB relied upon the opinions of Drs. Direnfeld and Lau, both of whom apportioned 50% causation of Pave's work injury to physical conditions that preexisted the work accident, and 50% to his work accident.  But Dr. Direnfeld also "noted that prior to the March 19, 2010 work injury, [Pave] did not have symptoms of cervical myelopathy."  LIRAB noted (in unchallenged findings):

> 14.  In his September 17, 2010 report, Dr. Direnfeld explained that apportionment applied to [Pave]'s impairment rating because in the absence of pre-existing cervical spondylolysis[13] it was **improbable** that [Pave] **would have developed** signs and symptoms of cervical myelopathy as a result of the March 19, 2010 work injury.  Dr. Direnfeld referred to Section 1.6b on page 11 of the AMA Guides, which discusses apportionment analysis as follows:
>
>> Apportionment analysis in workers' compensation represents a distribution or allocation of **causation** among multiple **factors** that caused or significantly contributed to the injury or disease and resulting impairment.  The factor could be

---

[13]  "Spondylolysis" means "disintegration or dissolution of a vertebra[.]"  Spondylolysis, Merriam-Webster, https://www.merriam-webster.com/medical/spondylolysis (last visited Dec. 15, 2022).

a pre-existing injury, illness, or impairment[.]

15. Dr. Direnfeld noted that before determining apportionment, pursuant to Section 1.6b, the physician must verify that all of the following are true:

1. There is current documentation of a prior factor.

2. The current permanent impairment is greater as a result of the prior **factor** (i.e. prior impairment, prior injury, or illness).

3. There is evidence indicating the prior **factor** caused or contributed **to the impairment** based on reasonable probability (greater than 50% likelihood).

(Reformatted) (emphasis added). Thus, Dr. Direnfeld apportioned 50% of the causation for Pave's post-work-accident disability to a preexisting condition. But Dr. Direnfeld gave no opinion that Pave's preexisting condition caused a disability — loss or impairment of a physical or mental function — before Pave's work accident. Nor did Dr. Lau, or any other physician involved in Pave's care or case, give such opinions. The only opinion about Pave's disability, or lack thereof, before his work accident was given by Dr. Brigham, who stated:

Degenerative findings alone would not serve as the basis for rating impairment. Degenerative changes [such as spondylosis and spondylolysis] are commonly seen among asymptomatic individuals. The [AMA] Guides explain on page 383:

The [Diagnosis-Related Estimates (**DRE**)] method recommends that physicians document physiologic and structural impairments relating to injuries or diseases other than common developmental findings, such as: 1) spondylolysis, found normally in 7% of adults; 2) spondylolisthesis, found in 3% of adults; 3) herniated disk without rediculopathy, found in approximately 30% of individuals by age 40 years; and 4) aging changes, present in 40% of adults after age 35 years and in almost all individuals after age 50. As previously noted, the presence of these abnormalities on imaging studies does not necessarily mean the individual has an impairment due to an injury. (5th ed., 383)

. . . .

18

> In summary, the day prior to the injury Mr. Pave would meet the definition of a DRE Cervical Category I in Table 15-5 (5th ed., 392):
>
> > No significant clinical findings, no observed muscle guarding or spasm, no documentable neurologic impairment, no documented alteration in structural integrity, and no other indication of impairment related to injury or illness: no fractures.
>
> ***This is associated with no impairment; i.e., his pre-existing impairment is 0%.***

(Emphasis added.)  The record contains no evidence — objective, subjective, or anecdotal — that would support a contrary opinion. Accordingly, it was clear error and wrong for LIRAB to apportion liability to SCF.

SCF challenges the following conclusion of law by LIRAB:

> The opinions of both of the examining/rating physicians in this case are consistent with the principle enunciated in <u>Flores v. City and County of Honolulu, Department of Parks and Recreation</u>, 67 Haw. 663 (1985), that a preexisting, asymptomatic degenerative condition can constitute a ratable impairment for apportionment purposes.

The conclusion correctly states the holding of <u>Flores v. City & Cnty. of Honolulu</u>, 67 Haw. 663, 701 P.2d 1282 (1985), <u>superseded in part by statute</u>, 1982 Haw. Sess. Laws Act 93, § 1 at 127-28, <u>as recognized in</u> <u>Bumanglag</u>, 78 Hawaiʻi at 280 n.3, 892 P.2d at 473 n.3.

The plaintiff in <u>Flores</u> had a heart attack in 1979, while working for the City.  He had no previous cardiac history, but his physician reported that he had preexisting asymptomatic arteriosclerosis.[14]  The DCD determined that Flores was totally and permanently disabled, and the City was liable to pay him workers compensation benefits.  The City appealed to LIRAB, and joined SCF as a party.  LIRAB determined that Flores was totally and permanently disabled, apportioned 20% of the disability to

---

[14]    "Arteriosclerosis" is "a chronic disease characterized by abnormal thickening and hardening of the arterial walls with resulting loss of elasticity[.]"  <u>Arteriosclerosis</u>, <u>Merriam-Webster</u>, <u>https://www.merriam-webster.com/dictionary/arteriosclerosis</u> (last updated Dec. 12, 2022).

the City (based upon a physician's opinion), and held SCF responsible for the remainder of the compensation benefits.  67 Haw. at 664-66, 701 P.2d at 1283-85.  SCF appealed.

The supreme court, applying the version of HRS § 386-33 in effect when Flores had his heart attack, Flores, 67 Haw. at 666-67, 701 P.2d at 1285, affirmed.  The court stated that Flores's "heart condition was a permanent partial disability that preexisted his employment although it was in an asymptomatic form[,]" id. at 669, 701 P.2d at 1286, and held that "[t]he pre-employment manifestation of a previous injury is not required before apportionment with the SCF can be made[,]" id. at 670, 701 P.2d at 1287.  In so holding, the supreme court stated:

> some states have required by legislation that preexisting injuries be registered with the commission administering the second injury fund.  The legislature, in time, may find it feasible to adopt a similar approach for Hawaii.  Or it may prefer to explicitly require previous injuries to be manifest.

Id. at 669-70, 701 P.2d at 1287 (footnote omitted).

HRS § 386-33 was amended in 1982 to add the thirty-two week threshold requirement in subsection (b).  Thus, the legislature explicitly required that a preexisting condition manifest itself in "loss or impairment of a physical or mental function" that would "support an award of thirty-two weeks of compensation for permanent partial disability" before SCF would become liable to pay PPD benefits.

In Bumanglag, which was decided after the 1982 amendment, the supreme court noted:

> Employer and Adjuster cite Flores v. City and County of Honolulu, 67 Haw. 663, 701 P.2d 1282 (1985), to support their argument that the mere fact that a previous disability or condition is asymptomatic before the work injury does not preclude apportionment with the SCF.  However, Flores was decided under HRS § 386-33 prior to the 1982 amendments which introduced the thirty-two week threshold requirement. The purpose of the threshold was "to significantly reduce the total number of cases in which the [SCF] is required to participate," Sen.Stand.Comm.Rep.No. 215, in 1982 Senate Journal, at 1041, by precluding any apportionment with the SCF in which the preexisting permanent partial disability does not reach the required threshold amount.

Bumanglag, 78 Hawaiʻi at 280 n.3, 892 P.2d at 473 n.3.[15]  Thus, "[s]ubsection (b) of HRS § 386-33 authorizes the director or the appellate board to apportion liability with SCF if the Director or Board determines that the previous permanent partial disability amounted to an award of thirty-two weeks of compensation."  Id. at 280, 892 P.2d at 473.

The claimant in Bumanglag had "no prior history of back pain or injuries" until a 1985 work accident.  78 Hawaiʻi at 277-78, 892 P.2d at 470-71.  The physician who reported the negative history initially apportioned 100% of Bumanglag's injury to his work accident "based upon reasonable medical probability and the AMA Guide."  Id. at 278, 892 P.2d at 471.  But the physician changed his opinion "and took a new position that 20 to 25 percent of [Bumanglag]'s overall impairment after the accident was attributable to [Bumanglag]'s preexisting congenital defects."  Id. at 280, 892 P.2d at 473.  The changed opinion was not based on the AMA Guide but on the physician's "own 'best guess.'"  Id.  LIRAB decided:

> **Even if** we were to accept Dr. Hendrickson's opinion as to [Bumanglag]'s preexisting impairment for his low back condition, and apply it to the highest permanent impairment rating for the lumber region (11% of the whole person), 20 to 25% of 11% would provide, at most, 2.75% preexisting permanent partial disability of the whole person.  Permanent partial disability of 2.75% of the whole person is equal to 10.71 weeks of compensation . . . .  It has not been shown that [Bumanglag] has a preexisting permanent partial disability of 32 weeks of compensation necessary to warrant apportionment with SCF.

Id. at 278, 892 P.2d at 471 (emphasis added).  The supreme court affirmed.  But the court did not reaffirm Flores.  Bumanglag stands for the proposition that a preexisting disability must support an award of at least thirty-two weeks of PPD compensation before liability can be apportioned to SCF under HRS § 386-33(b).

---

[15]  "Even when the meaning of a law is apparent on its face, legislative history may be used to confirm the court's interpretation of a statute's plain language."  Priceline.com, Inc., 144 Hawaiʻi at 88, 436 P.3d at 1171 (cleaned up).

See id. at 280, 892 P.2d at 473. As we noted above, the plain statutory language requires that a "disability" supporting an award of thirty-two weeks of PPD benefits must involve "loss or impairment of a physical or mental function." HRS § 386-1; see Ihara, 141 Hawaiʻi at 42, 404 P.3d at 308 ("The purpose of a PPD award . . . is to compensate a worker for the loss or impairment of a physical or mental function."). In any event, the proposition for which LIRAB cited Flores was abrogated by the 1982 amendment to HRS § 386-33. Bumanglag, 78 Hawaiʻi at 280 n.3, 892 P.2d at 473 n.3.

SCF also challenges the following conclusions of law by LIRAB:

> The extent to which a claimant may be awarded an amount for PPD is different from a medical impairment rating, because the extent of PPD for a work injury, and prior PPD are legal, not medical, determinations.
>
> Thus, while the SCF in this case would rely on the AMA Guides for rating purposes, supported by Dr. Brigham's opinion, and while the AMA Guides can be a helpful tool in determining disability, the Board is not bound by them. Cababat [sic] v. County of Hawaii, Dept. of Water Supply, 103 Hawaiʻi 1, 6 (2003).[16] In the instant case, the Board concludes that [Pave] had significant pre-existing **disability** in terms of congenital and degenerative **conditions** of the cervical spine, capable of supporting an award of 32 weeks of permanent disability, which combined with the work injury to the cervical spine resulted in greater disability than for the work injury alone.
>
> Given the foregoing, the Board concludes that permanent disability should be apportioned between the Employer/Insurance Carrier and the SCF.
>
> Given the foregoing, the Board concludes that 104 weeks of PPD should be paid by Employer/Insurance Carrier, with the balance of [Pave]'s PPD, stipulated to by the parties, payable to [Pave] by the SCF.

(Emphasis added.)

_____

[16] In Cabatbat, the supreme court held that HAR § 12-10-21 did not preclude the use of guides other than the AMA Guides, and that LIRAB's construction of the administrative rule to the contrary was wrong. 103 Hawaiʻi at 6, 78 P.3d at 761. Cabatbat does not stand for the proposition that DCD or LIRAB can make PPD determinations without reference to any medical guides.

An injured worker's final PPD rating is a legal determination made by LIRAB (or the DCD). Ihara, 141 Hawaiʻi at 43, 404 P.3d at 309. LIRAB can "take other factors into account to reach an accurate disability determination" "where the AMA Guides and the physician's assessment do not give an accurate portrayal of the total loss [or] impairment[.]" Id. at 44, 404 P.3d at 310 (citing Cabatbat, 103 Hawaiʻi at 9, 78 P.3d at 764). Those other factors can include "information about the individual's skills, education, job history, adaptability, age, and environment requirements and modifications." Duque v. Hilton Hawaiian Vill., 105 Hawaiʻi 433, 439, 98 P.3d 640, 646 (2004) (citation omitted). There must, however, be substantial evidence in the record supporting LIRAB's determination that SCF is obligated to pay PPD benefits because of a preexisting disability capable of supporting at least 32 weeks of compensation.

In Pave's case, LIRAB incorrectly equated a preexisting "condition" with a preexisting "disability." Thus, LIRAB's "conclusion" that Pave had a preexisting "disability . . . capable of supporting an award of 32 weeks of permanent disability" was actually a finding of fact and clearly erroneous based on the record. Drs. Direnfeld and Lau opined that Pave's preexisting condition contributed to cause his work injury, but neither reported that the condition had caused a loss or impairment of Pave's physical functioning before his work accident. The record is to the contrary; it contains no evidence that Pave's spinal stenosis or cervical spondylosis caused any loss or impairment of his physical or mental functions before his work accident, much less any loss or impairment that would support an award of thirty-two weeks of compensation for PPD.

"[A] PPD award requires a finding of some physical or mental impairment." Ihara, 141 Hawaiʻi at 45, 404 P.3d at 311. Because there is no evidence in the record that Pave had any neck impairment before his work accident, it was clear error and wrong for LIRAB to apportion liability for Pave's PPD benefits to SCF.

**The Dias Appeal**

Dias's knee injury was evaluated by doctors John **Endicott**, Brian **Mihara**, and James **Scoggin**; each of whom reviewed medical records and examined Dias on behalf of Dias's employer. LIRAB made the following findings of fact that are unchallenged and binding on appeal:

> 1.    [Dias] sustained a work injury to his right knee on June 4, 2008.
>
> 2.    [LIRAB] finds that [Dias] sustained 45% PPD of the right leg, as determined by the Director.
>
> 3.    [LIRAB] finds that [Dias] had osteoarthritis[17] of his right knee before his June 4, 2008 work accident, and that the work accident aggravated [Dias]'s osteoarthritis.

The issue in the Dias Appeal is not whether Dias's preexisting osteoarthritis was aggravated by his work injury; it is whether his preexisting osteoarthritis actually impaired his right knee before his work accident.

SCF challenges LIRAB's FOF nos. 4, 5, 6, 7, 9, 10, 11, 12, and 14; and COL no. 1.  LIRAB found:

> 4.    [LIRAB] finds that despite the unanimous opinions that [Dias] had a pre-existing right knee **condition**, a specific rating of pre-existing **impairment** was not provided by Drs. Endicott, Mihara, and [sic] Scoggin, because of the lack of information [in] the medical records and/or format of the diagnostic films.

(Emphasis added.)

The record on appeal supports LIRAB's finding that Dias had a preexisting right knee condition (osteoarthritis), and that

---

[17]    "Osteoarthritis" is defined as:

> [A] common form of arthritis typically with onset during middle or old age that is characterized by progressive degenerative changes in the cartilage of one or more joints (as of the knees, hips, and hands) accompanied by thickening and overgrowth of adjacent bone and that is marked symptomatically chiefly by stiffness, swelling, pain, deformation of joints, and loss of range of motion.

Osteoarthritis, Merriam-Webster, https://www.merriam-webster.com/dictionary/osteoarthritis (last updated Nov. 29, 2022).

Drs. Endicott, Mihara, and Scoggin did not rate Dias as having any functional impairment of the right knee before his work accident.

Dias's right knee was x-rayed two weeks after his work accident. The radiologist noted: "Fairly advanced degenerative changes are seen. There is moderately severe narrowing of the medial joint compartment and tricompartment degenerative spurring demonstrated. Lateral view demonstrates a [sic] 11 mm calcification in the suprapatellar region along with a probable joint effusion."

Dr. Endicott examined Dias on May 5, 2009 (one year after the work accident). Dr. Endicott reported that Dias was a 58-year-old pool construction foreman who had done construction work for most of his adult life. Dias denied having any significant problems with his knee until his work accident. He owned two horses and enjoyed riding, but had not done so after the work accident because of the problems with his knee. Dr. Endicott reported:

> The diagnosis is a right knee sprain with probable medial meniscus tear, and a 10 degree flexion contracture as a result of aggravation of the underlying pre-existing osteoarthritis in the right knee. . . .
>
> . . . .
>
> There is evidence of pre-existing osteoarthritis that was reportedly **not symptomatic until after the subject injury**. This is contributing to the current scenario because of aggravation of the underlying degenerative osteoarthritis.
>
> . . . .
>
> It appears that the right knee condition is due to the employment factors with the twisting injury of June 4, 2008. There is no evidence that his condition would have developed but for the distinctive conditions of employment. **It does not appear that his condition is a natural progression of the pre-existing osteoarthritis**. It appears that the injury caused a permanent aggravation of the pre-existing **condition**.
>
> . . . .
>
> It appears that he can return to work avoiding kneeling on the right knee, or activities that require flexion of the right knee more than 90 degrees. He can work avoiding

> kneeling and flexion activities in the right knee. ***The restrictions are the results [sic] of work injury***. . . .
>
> . . . .
>
> ***There is no evidence of pre-existing impairment or need for apportionment at this time***.

(Emphasis added.)

Dr. Mihara examined Dias on May 2, 2012 (four years after the work accident). Dr. Mihara noted that Dias had

> sprains to multiple joints including the knees prior to 2008 related to training horses. He says that none of the injuries were very bad and none of them required any medical care. He denies any permanent problems from any of these horse injuries.
>
> . . . .
>
> . . . [H]e used to enjoy hiking and riding his horse. He says that the last time he went riding on his horse was about a year ago. He says that this is simply too painful. The last time he played volleyball was about a year ago [(three years after the work accident)]. He notes that he did not sustain any lingering injury to his knee, riding his horse or playing volleyball.

Dr. Mihara noted that Dr. Endicott had evaluated Dias in 2009, and that Dias's records did not mention any significant anterior or posterior right knee instability before his work injury.

Dr. Mihara diagnosed probable right knee medial meniscal tear from his work accident, which aggravated preexisting osteoarthritis. He reported:

> [Dias] ***denies any history of significant injury in the past*** noting that he has injured multiple joints but never had to see a doctor for any of these injuries while training horses. The medical record indicates that he did attend physical therapy for a right knee sprain approximately 25 years prior to the listed date of injury, but he ***healed up without any residuals***. The medical record indicates that there were no previous x-rays to the right knee for comparison, ***suggesting that his right knee was doing okay prior to 2008*** [the date of his work injury].
>
> . . . .
>
> 3.  I see evidence of preexisting osteoarthritis which has contributed slightly to his current condition. At the same time, the vast majority of these problems would appear to be related to the indexed injury of

06/04/08. While he had preexisting osteoarthritis, the available record suggests that this was **mild and perhaps not even impairing**. . . .

4.    [Dias]'s current condition is primarily due to the [work] injury of 06/04/08. The condition diagnosed **would not have developed if not for this injury**. This was a permanent aggravation of his preexisting osteoarthritis.

(Emphasis added.)

After giving an estimated impairment rating but noting that Dias had not medically stabilized, Dr. Mihara noted: "Based on what I could gather from the available [x-rays], it did not appear that his arthritis prior to 2008 was an impairment-level problem."

Dr. Scoggin examined Dias on July 15, 2013 (five years after the work accident). Dr. Scoggin reported:

Mr. Dias recalls that he had an injury to his right knee when he twisted it **30 years ago**. He states that a rope hit him and he fell over while working with horses. He recalls that his right knee swelled after that injury, and he saw a doctor. He was told that he had strained ligaments in his right knee. He did not require crutches at that time, but he recalls that he was sent to physical therapy.

**He had no other trouble with his right knee after that**. He had no instability of his right knee after that. He had no other swelling of his right knee after that. He never saw a doctor again for his right knee again until the 6/4/08 [work] incident.

. . . .

2.    **Mr. Dias denies any symptoms in his right knee prior to 6/4/08**. X-rays taken on 6/19/08, however, showed advanced degenerative changes in the right knee, including moderately severe narrowing of the medial joint compartment and tricompartmental degenerative spurring. A large calcification or loose body was present in the suprapatellar region.

Clearly, these degenerative changes could not have occurred in the interval between 6/4/08 and 6/19/08, but rather represent advanced degenerative changes that developed over a prolonged period of time. These changes were confirmed and further elucidated on the MRI of 10/9/08, which again showed severe thinning of the cartilage of the medial compartment, loose bodies, and tricompartmental osteoarthritic changes, mainly at the medial and patellofemoral compartments.

Mr. Dias'[s] injury, it should be recalled, was a twisting injury on 6/4/08, which he was able to "work

> through." It was noted that he did not try any medications. Apparently, no Emergency Room visit was required, and no visit to a doctor of any kind was required for approximately 2 weeks. There was no fracture or dislocation.
>
> Most likely, then, this represented a symptomatic aggravation of his pre-existing osteoarthritis.

(Emphasis added.)

Dr. Scoggin diagnosed "[r]ight knee strain resulting in symptomatic aggravation of pre-existing osteoarthritis." He explained:

> At most, this would appear to be a symptomatic aggravation of very significant pre-existing osteoarthritis, which would have been expected to progress with time, even in the absence of any trauma.
>
> The prognosis for the injury is good.
>
> The prognosis for the pre-existing osteoarthritis is poor, since osteoarthritis is a progressive condition, in general.
>
> . . . .
>
> It should be absolutely clear that Mr. Dias had pre-existing osteoarthritis, which was well documented on his initial x-rays, subsequent MRI, and eventually his arthroscopy. None of these imaging findings are explainable based upon the injury that occurred on 6/4/08.
>
> *Mr. Dias states that his knee was asymptomatic prior to 6/4/08*. No prior medical records from before that date were available for my evaluation.
>
> While Mr. Dias may have become symptomatic on 6/4/08, according to his history, there is certainly no objective finding on any of his imaging studies or objective finding at the time of his arthroscopy that is explainable based upon the 6/4/08 injury as it has been described.
>
> . . . .
>
> It is impossible to explain all of Mr. Dias'[s] osteoarthritis as being related to the incident that occurred on 6/4/08, since his imaging studies clearly showed that the osteoarthritis was already present. If Mr. Dias first noticed symptoms of his osteoarthritis as a result of the 6/4/08 incident, it is not the same as saying that the 6/4/08 incident <u>caused</u> his osteoarthritis.

(Emphasis added.)  In other words, Dr. Scoggin reported that Dias had preexisting osteoarthritis that became symptomatic when he twisted his right knee while working, but the work accident did not cause the osteoarthritis.

Dr. Scoggin was asked:

9.    If it is necessary to rate a pre-existing *condition* based on worsening or aggravation, please provide an apportionment.  Please also apportion the impairment that may be attributed to any intervening trauma.

(Emphasis added) (underscoring omitted).  He answered:[18]

Osteoarthritis, in general, is a degenerative condition, with progression, as expected[, ]with time.

I would note that at the time of John S. Endicott, M.D.'s Independent Medical Evaluation (IME) on 5/5/09, Mr. Dias only had a 10° flexion contracture, which was rated as a 20% lower extremity impairment.

Mr. Dias has subsequently had an arthroscopy of the knee.  At the time of that arthroscopy, no meniscectomy was performed, no meniscus tear was found, and no chondroplasty was required. Nevertheless, Mr. Dias'[s] range of motion has decreased in the 4 years since the 5/5/09 Independent Medical Evaluation.  This is due to the progressive osteoarthritis, to a reasonable degree of medical probability, and is no longer explainable based upon the injury that occurred on 6/4/08, to a reasonable degree of medical probability.

I would therefore apportion the *current impairment* as 25% to the 6/4/08 injury and 75% to his pre-existing osteoarthritis *and its expected progression with time*, to a reasonable degree of medical probability.

(Emphasis added.)  There is no evidence in the record that Dias had any limitation in the range of motion or other impairment of

---

[18]   Dr. Scoggin prefaced all of his answers by stating:

The following are answers to your specific questions only. The answers to these specific questions are advisory in nature only.  They are not to be taken out of context of the more full discussion in the body of this report.  In and of themselves, these answers may not accurately reflect the complete opinions offered in this report, and taken out of context, may result in inaccurate interpretation or opinion.

his right knee function before his work accident.  Dr. Scoggin's report read as a whole apportioned the causation of Dias's present impairment five years after his work accident. Dr. Scoggin never opined that Dias's osteoarthritis had caused any impairment before Dias's work accident — much less any impairment that would support an award of thirty-two weeks of compensation for PPD.

Under these circumstances, LIRAB's FOF no. 4 that "despite the unanimous opinions that [Dias] had a pre-existing right knee **condition**, a specific rating of pre-existing **impairment** was not provided by Drs. Endicott, Mihara, and Scoggin, because of the lack of information [in] the medical records and/or format of the diagnostic films" was not clearly erroneous.  (Emphasis added.)  But the issue before LIRAB was not whether Dias had a preexisting condition; it was whether Dias's preexisting right knee condition had actually impaired his physical functioning before his work accident.  No doctor expressed an opinion, and the record contains no evidence, that Dias had a preexisting "disability" that combined with his work injury to cause a greater post-work-accident disability.

LIRAB found:

> 5.    Although Drs. Endicott and Mihara acknowledged a pre-existing **condition**, neither apportioned permanent impairment to such **condition**, based on [Dias]'s representations that he had no problems for many years before the industrial accident and/or because of a lack of specificity in the medical records.

(Emphasis added.)  FOF no. 5 is supported by substantial evidence and is not clearly erroneous.

LIRAB found:

> 6.    Given the extent of [Dias]'s pre-existing right knee **condition** as reported by the radiologist reading the July 19, 2008 films, [LIRAB] **does not credit** the opinions of Drs. Endicott and Mihara that no apportionment of permanent **impairment** was warranted.

(Emphasis added.)

LIRAB conducts "a de novo, trial-like hearing on the appeal from the [DCD]'s determination." Ihara, 141 Hawaiʻi at 43, 404 P.3d at 309 (citing HRS § 386-87(a)-(c)). If FOF no. 6 was a finding of witness credibility, it would not be disturbed on appeal. Tamashiro v. Control Specialist, Inc., 97 Hawaiʻi 86, 92, 34 P.3d 16, 22 (2001). However, if "the record reveals no conflict in the evidence or impeachment of any witness, the court will not sustain a finding as to credibility which it is firmly convinced is mistaken." De Victoria v. H&K Contractors, 56 Haw. 552, 559, 545 P.2d 692, 698 (1976) (citations omitted). The record in the Dias Appeal contains no evidence that Dias's osteoarthritis caused an actual loss or impairment of a physical or mental function before his work accident. Accordingly, LIRAB's failure to "credit" the opinions of Drs. Endicott and Mihara was clear error. And to the extent FOF no. 6 was a conclusion of law that an asymptomatic preexisting condition which did not cause actual loss or impairment of a physical or mental function before a work accident warranted apportionment under HRS § 386-33, it is wrong.

LIRAB found:

> 7.    [LIRAB] finds that Dr. Scoggin presented a clinical judgment apportionment, which took [Dias]'s significant pre-existing osteoarthritis into account.
>
> . . . .
>
> 9.    [LIRAB] credits Dr. Scoggin's opinion regarding apportionment.

LIRAB's finding that Dr. Scoggin took Dias's significant preexisting osteoarthritis into account in making an apportionment was supported by substantial evidence and not clearly erroneous. Dr. Scoggin, however, apportioned the cause of Dias's present PPD five years after his work accident. Dr. Scoggin did not apportion PPD before and after Dias's work accident; he never opined that Dias's osteoarthritis caused a loss or impairment of his physical functioning before his work accident. There is no evidence in the record that Dias had a

preexisting loss or impairment of right knee function that, combined with his work-related loss or impairment, resulted in a greater level of total PPD. See Bumanglag, 78 Hawai'i at 280, 892 P.2d at 473. Thus, FOF nos. 7 and 9 are not relevant to whether SCF should be liable for part of LIRAB's PPD award.

LIRAB found:

> 10. [LIRAB] finds that under the AMA Guides' stated method of apportionment, no pre-existing impairment could be determined, because the medical records before the accident lacked specificity as to [Dias]'s pre-injury ranges of motion or measurements of decreased space in [Dias]'s right knee.
>
> 11. Applying Dr. Scoggin's apportionment (75% x 45% permanent impairment) results in 33.75% pre-existing permanent impairment of the right knee.
>
> 12. [LIRAB] finds that Employer met its burden of proving, by a preponderance of the evidence, that [Dias] had a pre-existing PPD of more than 32 weeks.

FOF no. 10 is supported by substantial evidence and not clearly erroneous.

FOF no. 11 is actually a conclusion of law; it is wrong. Dr. Scoggin did not apportion Dias's present disability between a pre-work-accident impairment capable of supporting at least 32-weeks of compensation, and a post-work accident impairment. See Bumanglag, 78 Hawai'i at 280, 892 P.2d at 473. Instead, Dr. Scoggin apportioned causation of Dias's present PPD between an asymptomatic pre-work-accident condition that was not the cause of any preexisting impairment, and a work injury that caused all of the impairment.

FOF no. 12 is clearly erroneous because there is no evidence in the record that Dias's right knee was actually impaired before his work accident.

We need not consider LIRAB's FOF no. 14, which disapproved SCF's proposed findings of fact.

Finally, LIRAB concluded:

> 1. [LIRAB] concludes that permanent disability should be apportioned between Employer/Insurance Carrier and the SPECIAL COMPENSATION FUND.

This is a combined finding of fact and conclusion of law. It is clearly erroneous because no doctor opined that Dias's right knee osteoarthritis had caused him loss or impairment of physical function before his work accident, and the record contains no other evidence that Dias's right knee osteoarthritis caused any loss or impairment of his right knee function before his work accident. Accordingly, it was wrong for LIRAB to apportion liability for Dias's PPD benefits to SCF.

### CONCLUSION

In each of these cases, there was no expert opinion or other evidence that the injured person's asymptomatic preexisting condition had caused any actual "disability" — that is, "loss or impairment of a physical or mental function" — before the person's work accident. Under those circumstances, it was error for LIRAB to apportion liability for the person's PPD award to SCF. LIRAB's decision and order in each case is reversed.


On the briefs:

Herbert B.K. Lau,
Frances E. H. Lum,
Deputy Attorneys General,
Department of the Attorney
General, State of Hawaiʻi,
for Appellant-Appellant
Special Compensation Fund
in CAAP-17-0000600.

Robyn M. Kuwabe,
Frances E. H. Lum,
Deputy Attorneys General,
Department of the Attorney
General, State of Hawaiʻi,
for Appellee-Appellant
Special Compensation Fund
in CAAP-17-0000925.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Karen T. Nakasone
Associate Judge

Brian G.S. Choy,
Keith M. Yonamine,
for Employer-Appellee/Appellee
Production Processing, Inc. and
Insurance Carrier-Appellee/Appellee
Gallagher Bassett Services, Inc.
in CAAP-17-0000600.

Brian G.S. Choy,
Keith M. Yonamine,
for Employer-Appellant/Appellee
Altres, Inc. and Insurance
Carrier-Appellant/Appellee
Hawaii Employers' Mutual Insurance
Company, Inc.
in CAAP-17-0000925.